IN RE INTEREST OF AMBER G., JESSICA G., ADAM G., AND BRITTANY G., CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. TERRY G., APPELLANT, AND DOLLY C., APPELLEE.

554 N.W.2d 142

Filed October 18, 1996.   No. S-95-1266.

Alice L. Rokahr for appellant.

Don Stenberg, Attorney General, Royce N. Harper, and Beth Tallon, Special Assistant Attorney General, for appellee State.

Jeffrey H. Greve, Cedar County Attorney, for appellee State.

Scott D. Freese, of Hutton, Freese & Einspahr, P.C., for appellee Dolly C.

William L. Binkard, guardian ad litem.

WHITE, C.J., CAPORALE, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ., and QUIST, D.J.

WHITE, C.J.

Terry G. appeals the order of the county court for Cedar County, Nebraska, approving the case plan of the Department of Social Services (DSS) recommending permanent guardianship of his four minor children. In its October 26, 1995, journal entry, the county court found that all reasonable efforts had been made to return the juveniles to a parental home, that custody should remain with DSS, and that the DSS case plan should be approved. We affirm.

Terry G. (father) and his ex-wife, Dolly C. (mother), have four minor children—Amber G., Jessica G., Adam G., and Brittany G. The mother was given sole custody of the children following the mother and father's divorce in 1991, and the father was given visitation rights. The father subsequently moved to Missouri.

On January 18, 1992, the two oldest children, Amber and Jessica, were removed from the mother's home pursuant to the emergency placement provisions of Neb. Rev. Stat. § 43-250 (Reissue 1993) after law enforcement officials received reports of sexual abuse and neglect. The juveniles were placed in the temporary custody of DSS pending adjudication. On February 25, with the mother, the guardian ad litem, the county attorney, and the juveniles present, the county court adjudicated the juveniles to be children delinquent within the provisions of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1993). At this hearing, the court continued temporary custody of the juveniles with DSS and ordered that DSS make all reasonable efforts to reunite the children with their mother. The father was not named as a parent in the petitions filed on behalf of Amber and Jessica.

DSS initiated a plan dated April 1992 for reunification with the mother and visitation with the father pursuant to its statutory authority under Neb. Rev. Stat. § 43-285 (Reissue 1993), and both parents agreed to the placement of the children in foster care. This first DSS report listed its goal as "[r]eunification . . . with a parent" and indicated a willingness to place the children with the father, provided the Missouri Interstate Compact home study was favorable.

During subsequent investigations into the mother's home, DSS determined that the two youngest children, Adam and Brittany, were also at risk. Petitions alleging abuse and neglect under § 43-247(3)(a) as to Adam and Brittany, and listing both the mother and father as parents, were filed on June 4, 1992, and a hearing was held on June 11, with the father present. Due to the incapacity of the mother, the adjudication hearings were continued until November 5, 1992, at which time the court found Adam and Brittany to be within the provisions of § 43-247(3)(a) and placed them in foster care with a directive to reunify them with a parent if possible. All parties, including the father, agreed to temporary custody of the children with DSS.

From April 1992 to June 1995, DSS made continued efforts to reunite the family. Visitations with both parents occurred on a regular basis, and the DSS reports recommended counseling and therapy for both the father and the mother. The DSS reports indicated "[p]ast abuse and chaotic or dysfunctional life styles by both parents," that "placement [with the father] has been questioned as marginal due to past history," and that while both parents' lifestyles "must change to provide safety and stability . . . [t]his is questionable due to the ongoing instability both have or have had."

During this period, the father made numerous requests for placement or relocation of the children closer to his Missouri home, but DSS denied these requests because the Missouri Interstate Compact home study indicated potential risk factors in placement with the father. The home study documented "[a] report of inappropriate punishment [that] has been substantiated in the past . . . [a] report of poor hygiene, bruises and

welts [and that the father] has had ongoing Protective Services cases opened in the past . . . ."

The father requested a hearing prior to the disposition at issue in this case for the purpose of determining (1) whether the court was obligated under Neb. Rev. Stat. § 43-284 (Reissue 1993) to find that out-of-home placement continues to be the least restrictive placement possible as to both parents and (2) whether the situation leading to the removal of the children from the mother existed as to both parents. The court refused to review the question of least restrictive placement because the father failed to appeal any orders of the court regarding placement within the statutory time limit. Additionally, the court found that it was required to consider the situation of the children at the time of removal and not the situation of both parents, and that it was therefore required to evaluate only the environment in which the children were residing at the time of the removal in order to adjudicate them within the provisions of § 43-247(3)(a).

On August 28, 1995, the court held a dispositional hearing regarding the approval of the DSS report dated June 1, 1995, and supported by DSS, the mother, and the guardian ad litem. The father opposed the case plan because it recommended permanent guardianship. DSS advocated permanent guardianship as in the best interests of the children because of continued significant concerns about placement with the father and because of the children's need for stability and permanency. During the hearing, Brenda Wiedmeier, the social worker in charge of the case, testified as to some of DSS' concerns about the father as a placement possibility:

> The children reported dad had said [during visitation that the foster parents] were thieves and liars. [The foster mother] is fat because she eats too much candy and called her fatso. . . . [It was the social worker's] fault for not spending more than five dollars [on gifts for the children during visitation]. That dad said he could knock [the social worker] clear across the street. That he wanted to push his fist down [the foster mother's] throat. Lot of swearing, such as, and pardon my language[,] ass hole, shit used frequently. Threaten to sue the [foster family],

accusing them of taping conversations. That he was going to start trouble in Clearwater. I guess that's kind of self explanatory in how that would affect the children and the fear they have. The last visit I made with the children about the visit, they said they were scared of dad. Dad was mean. And I know that's hard to hear for dad, or I would think it would be. It creates turmoil in their lives. It creates fear.

Wiedmeier also testified that during visits with the father, the children were allowed to hit one another, the father stated that he hated Adam, the children wore feces-stained underpants and other unwashed clothing, the children's hair was washed only once, and the children took their own medication without adult supervision.

At the hearing, the report of clinical social worker Daniel S. Campbell was admitted into evidence. Campbell reported that during his June 4, 1993, interview with the father, the father explained his philosophy for managing his children on a daily basis as follows: "When kids ain't fightin' or runnin' away, I don't give a shit what they do." Campbell noted that while the father was well-intentioned, he

seem[ed] nearly oblivious to the numerous other potential hazards to [his children's] well-being. . . . [H]is ability to live up to that expectation is extremely questionable, due to his inattentiveness which would mean, in all probability, that he would be unaware of a need for protection for his children until the damage had been done.

The father admitted at this hearing that he had made threats against the foster family and the social worker. The father also testified that he has dreams in which he can predict future events and stated as follows:

I go to sleep at night. About five minutes, if I'm asleep I see things. And if — I don't want to see them, so I wake up. But they just keep coming back. Three nights in a row. And when they do, then I know it's going to happen. That's all I can say.

Julie Ohlund, a therapist who worked with the father, mother, and children, testified that in her opinion, guardianship would be in the best interests of the children due to the

stability and follow-through provided by the foster family. The guardian ad litem also stated on behalf of the children that "they are quite happy in their present situation" with the foster family.

In an order dated August 28, 1995, the court continued custody of the children with DSS and stated that it would review the case plan. On October 26, 1995, the court approved the case plan recommending permanent guardianship with the foster family. The court found that "all reasonable efforts have been made to prevent or eliminate the need for removal of the juveniles from their home and to make it possible for the juveniles to return to the parental home." The father appealed.

On appeal, the father assigns the following errors: (1) The juvenile court lacked jurisdiction for adjudication when there was no allegation that the factual basis justifying removal from the mother also justified refusal to place the children with the father; (2) the dispositional phase of juveniles adjudicated under § 43-247(3)(a) is unconstitutional in its application when the court determines only whether the juveniles should be returned to the parental home from which they were removed and disregards the constitutional rights of the noncustodial parent; (3) the county court erred in finding that reasonable efforts had been made to reunite the children with a parent because the court refused to consider placement with the noncustodial biological parent and failed to provide a factual basis for its findings; and (4) the court erred in approving the case plan permitting permanent guardianship because this case plan resulted in a de facto termination of the father's parental rights, and the juvenile court's exclusive jurisdiction in these matters deprives the father of any method through which to seek custody.

On appeal of a final order of a juvenile court, we try factual questions de novo on the record. Although our review is independent of the findings of the trial court, when there is conflict, we may give weight to the fact that the trial court observed the witnesses and accepted one version of facts rather than another. *In re Interest of L.W.*, 241 Neb. 84, 486 N.W.2d 486 (1992). This court reaches conclusions of law independent of those of the trial court. *State v. Yelli*, 247 Neb. 785, 530

N.W.2d 250 (1995). Absent an abuse of discretion, a trial court's decision bearing on custody of a minor child will not be disturbed on appeal. *Demerath v. Demerath*, 233 Neb. 222, 444 N.W.2d 325 (1989).

In the father's first assignment of error, he argues that the juvenile court could not properly take jurisdiction if there were no allegations that the father abused and neglected the children. The father seems to rely heavily on the theory that the juvenile court justified taking jurisdiction of the children because the father was not given custody during the 1991 divorce proceedings and was therefore unfit to have custody in this proceeding. This is clearly an erroneous interpretation of the jurisdiction of the juvenile court and the two-step process involved in juvenile proceedings.

It is important to note that if the juvenile court's jurisdiction over the children at the adjudication stage was based upon the earlier divorce decree giving sole custody to the mother, this would be in error. The placement of a child in the custody of one parent as opposed to the other in a divorce action does not extinguish the noncustodial parent's right to custody, nor does it constitute an adverse determination of the fitness of the noncustodial parent in that or other proceedings. *Matter of Mary L.*, 108 N.M. 702, 778 P.2d 449 (N.M. App. 1989).

In Nebraska, the rights of the parent and the child are protected by the separate adjudication and dispositional phases of the dependency proceeding. A petition brought under § 43-247(3)(a) is brought on behalf of the child, not to punish the parents. *In re Interest of Constance G.*, 247 Neb. 629, 529 N.W.2d 534 (1995). The purpose of the adjudication phase of the proceeding is to protect the interests of the child; the purpose of the dispositional phase is to determine placement and the rights of the parties in the action. *Matter of La Shonda B.*, 95 Cal. App. 3d 593, 157 Cal. Rptr. 280 (1979). It is not improper for the court to sustain jurisdiction at the adjudication phase if the State makes a proper prima facie showing of lack of proper parental care in the child's present living situation. See *In re Interest of Constance G., supra.*

In this case, the issue at the adjudication phase was whether the children lacked proper parental care in the custody of their

mother. The question of whether the father was fit or unfit to have custody did not arise and should not have arisen until the dispositional phase. The record clearly indicates that the mother admitted to the allegations of the petitions at each adjudication, and thus the juvenile court could properly take jurisdiction and did so without reference to the determination of custody in an unrelated divorce proceeding that occurred well before this case arose. To protect the minor children involved in this case from further abuse in the mother's home, the court took jurisdiction and removed the children from their mother's custody. See *In re Interest of Constance G., supra.* Because we find that the juvenile court properly took jurisdiction at the adjudication phase of this case, we find the father's assignment of error as to jurisdiction to be without merit.

The father's next assignment of error involves the constitutionality of the dispositional phase of proceedings involving juveniles adjudicated abused or neglected under § 43-247(3)(a). The father argues that § 43-284 is unconstitutional because it does not require a determination of whether placement with the noncustodial parent is proper when return to the home of the custodial parent is contrary to the welfare of the child. The father further argues that the statute violates his rights of due process in that it does not require the court to consider the homes of both parents in its placement decision.

Section 43-284 provides in pertinent part:

> When any juvenile is adjudged to be under subdivision (3) of section 43-247, the court *may* permit such juvenile to remain in his or her own home subject to supervision or *may* make an order committing the juvenile to the (1) care of some suitable institution, (2) care of some reputable citizen of good moral character, (3) care of some association willing to receive the juvenile . . . (4) care of a suitable family, or (5) care and custody of the Department of Social Services.

(Emphasis supplied.)

This statutory provision does, by its liberal use of the word "may," authorize the juvenile court to exercise broad discre-

tion in its disposition of children who have been found to be abused or neglected. This court as well has acknowledged the broad discretion accorded juvenile courts in their determination of the placement of children adjudicated abused or neglected. See, *In re Interest of K.L.C. and K.C.*, 227 Neb. 76, 416 N.W.2d 18 (1987); *In re Interest of V.T. and L.T.*, 220 Neb. 256, 369 N.W.2d 94 (1985).

However, this broad discretion is not without limitation. This court has long held that in a child custody controversy between a biological or adoptive parent and one who is neither a biological nor an adoptive parent of the child involved in the controversy, a fit biological or adoptive parent has a superior right to the custody of the child. *Stuhr v. Stuhr*, 240 Neb. 239, 481 N.W.2d 212 (1992). A court may not properly deprive a biological or adoptive parent of the custody of the minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship or has forfeited that right; neither can a court deprive a parent of the custody of a child merely because the court reasonably believes that some other person could better provide for the child. *State v. Worrell*, 198 Neb. 507, 253 N.W.2d 843 (1977); *Nielsen v. Nielsen*, 207 Neb. 141, 296 N.W.2d 483 (1980).

While it is true that a parent has a natural right to the custody of his child, the court is not bound as a matter of law to restore a child to a parent under any and all circumstances. *Nielsen v. Nielsen, supra*. Instead, the parent's natural right is limited by the State's power to protect the health and safety of the children. *Cornhusker Christian Ch. Home v. Dept. of Soc. Servs.*, 227 Neb. 94, 416 N.W.2d 551 (1987). The best interests of the children must always be considered in determining matters of child custody, and where the parent is shown to be unfit or to have forfeited his superior right to custody, the court may place the children in the custody of an unrelated third party. *Hensman v. Parsons*, 235 Neb. 872, 458 N.W.2d 199 (1990); *Nielsen v. Nielsen, supra*.

In the instant case, the court in its dispositional decision was required to consider the placement of the children with their biological father because Nebraska law creates a pre-

sumption in favor of custody with a biological parent as against an unrelated third party. It is clear from the record that the court and DSS did indeed make considerable efforts to reunite the children with a parent and to facilitate return of the children to a parental home.

The first two children were removed from their custodial parent's home on January 18, 1992. Although the father was not notified of the removal prior to the adjudication of these children by the court and their placement in the temporary custody of DSS, the father, when notified, agreed to their placement with the foster family. The father received notification concerning the removal and adjudication of the youngest two children and again agreed to their placement with the foster family. The father continued to agree to this placement until December 1993.

From April 1992 to June 1995, DSS' goal as indicated in its reports was to reunite the children with a parent. DSS also worked extensively with both the father and mother, arranging parenting classes, therapy, and visitation with the children. However, the father failed to attend all of the classes and scheduled therapy sessions, and DSS received the Missouri Interstate Compact home study which indicated significant concerns about placement of the children with their father.

By 1995, DSS had worked with the parents for almost 4 years and had seen little documented progress with regard to the concerns about placement with either parent due to concerns of unfitness. In June 1995, in an attempt to create some stability and security for the four children, and finding that placement with either parent would not be in the children's best interests, DSS recommended permanent guardianship for the children.

The father requested and received a hearing, and, as noted above, significant evidence was presented to indicate that the father was unfit to receive custody. When the children went to Missouri for visitation with their father, they came back with extensive bugbites, reported having not been washed or provided with clean clothes to wear, and expressed fear of their father due to his threats of violence against their foster family and the social worker involved in this case. The children

would also experience periods of "acting out," and demonstrated behavioral problems after visiting with their father.

In his meetings with the father, the clinical social worker expressed significant concerns about the father's fitness to have custody due to his claims that he can predict future events through his dreams and his lack of awareness as to the significant needs of his children. DSS reported that the father was simply unequipped to provide the special services and support required to assist his children with the aftereffects of their abuse and that he was not fit to have custody of the four minor children.

While it is true that the juvenile court has broad discretion to determine placement, that discretion is limited by the presumption in favor of the biological parent. Absent an affirmative finding of unfitness, the father is entitled to the custody of his children. Here, the court clearly considered placement of the children with either biological parent, found on the record before it that placement with either parent would not be in the best interests of the children, and determined that the father was unfit to have custody.

The father argues that because the court was not required to consider the homes of both parents in its placement decision under § 43-284, his constitutional rights of due process were violated. We disagree. Where there are two parents with separate homes, the children can be removed from the home of the unfit parent at the adjudication hearing without prejudicing the other parent's right to gain custody of the child at the dispositional hearing upon a sufficient showing that he or she is capable of providing proper parental care. *Matter of La Shonda B.*, 95 Cal. App. 3d 593, 157 Cal. Rptr. 280 (1979). Here, the evidence demonstrated that the father is not capable of providing proper parental care, as discussed above. Where the father received notice, an opportunity to be heard, and ample consideration at the hearings (all of which occurred in this case), the judge's decision not to place the children with their father did not violate his constitutional rights. *In re L.J.T.*, 608 A.2d 1213 (D.C. App. 1992).

The father also assigns as error the county court's finding that reasonable efforts had been made to reunite the children

with a parent and the court's failing to provide a factual basis for its findings. As noted above, clearly on the record the court and DSS did make reasonable efforts to reunite this family. From the time the children were removed from their home until the June 1, 1995, DSS report, DSS worked extensively with this family, arranging counseling, therapy, and visitation and offering other assistance. However, after $3^1/2$ years, the court found that the best interests of the children required that they have stability and permanency in the form of guardianship. We find, based on the discussion above, that the juvenile court did not abuse its discretion in so finding.

The father argues that the juvenile court failed to make factual findings on the record and that this is fatal to the court order. While the juvenile court is required to make specific findings of fact supporting the provisions contained in rehabilitation plans, our review is de novo on the record, and we find that the record is sufficient to support a finding of unfitness on the part of the father to have custody of his children and that the father's assignment of error in this regard is without merit. See *In re Interest of D.M.B.*, 240 Neb. 349, 481 N.W.2d 905 (1992).

Finally, the father argues that the case plan permitting permanent guardianship is tantamount to a de facto termination of parental rights and that the juvenile court's exclusive jurisdiction in § 43-247(3)(a) cases deprives the noncustodial parent of any method through which to seek custody. We note first that permanent guardianship does not result in a de facto termination of parental rights. A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. *In re P.F.*, 265 Ill. App. 3d 1092, 638 N.E.2d 716 (1994). "[L]egal custody is not parenthood or adoption. A person appointed guardian . . . is subject to removal at any time . . . ." *Stanley v. Illinois*, 405 U.S. 645, 648, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). In this case, where the father retains his visitation rights and there has been no authority given to consent to adoption, it is clear that all of the father's parental rights regarding his children have not been severed.

The juvenile court's exclusive jurisdiction in this matter does not deny the father the right to attempt to seek custody in the future. The father retains the right to petition the court for restoration of custody and full parental rights in the event of a change in the circumstances which at this time justify permanent guardianship and support a finding of the father's unfitness. See *In re P.F., supra*; *Custody of a Minor*, 21 Mass. App. 1, 483 N.E.2d 473 (1985).

We hold that the record supports a finding of unfitness as to the father; that the juvenile court had jurisdiction in this case; that the court, as required by statute and case law, did consider placement with the father and rejected such placement as not in the best interests of the children; and that permanent guardianship does not amount to a de facto termination of parental rights.

AFFIRMED.

FAHRNBRUCH, J., not participating.