IN RE INTEREST OF STEPHANIE H. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. ELIZABETH W., APPELLANT.
639 N.W.2d 668

Filed February 19, 2002.   No. A-01-959.

James A. Mullen, of Lefler & Mullen, and Andrew D. Strotman and LeAnn Larson Frobom, of Cline, Williams, Wright, Johnson & Oldfather, for appellant.

James S. Jansen, Douglas County Attorney, and Kim B. Hawekotte for appellee.

IRWIN, Chief Judge, and SIEVERS and MOORE, Judges.

SIEVERS, Judge.

William H., the custodial parent of three minor children, was reported to be sexually abusing his two minor daughters. As a result of that report, the Douglas County Attorney (State) filed a juvenile petition in the separate juvenile court of Douglas County alleging that the children were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1998), because they lacked proper parental care by reason of William's faults or

habits. The State also filed a motion asking that temporary custody of the children be placed with the Department of Health and Human Services (Department), which was ordered. The noncustodial parent, Elizabeth W., asked the juvenile court to place the children with her, but that request was denied, as was her request for visitation. Elizabeth contends that the actions of the juvenile court ignore her rights as a parent and deny her due process, given that there has been no allegation or proof by the State of her unfitness to have custody of her children.

## PROCEDURAL AND FACTUAL BACKGROUND

During a weekend visitation on July 20, 2001, with Elizabeth, Stephanie H., born April 14, 1987; Skyler H., born October 1, 1988; and Samantha H., born March 28, 1991, told Elizabeth that William, the custodial parent by virtue of the divorce decree, had been forcing the girls, Stephanie and Samantha, to perform oral sex on him. Elizabeth immediately called the police and took them to be interviewed.

The petition filed in the juvenile court in this matter on July 23, 2001, alleged that William was the natural father of the two girls and their brother, Skyler; alleged that the children lacked proper care by reason of William's inappropriate sexual contact with the girls; and requested that the court make such orders as were appropriate concerning the care, custody, and control of the children. On that same date, the State filed its motion for temporary custody asking for placement of the children with the Department and attaching thereto the affidavit of Lisa Crouch, the police officer who had interviewed the girls. That motion alleged that the need for detention existed because of immediate and urgent necessity for the protection of the children.

Crouch's affidavit alleged that Elizabeth "does not have any legal custody rights at the time of th[is] report although [William] and [Elizabeth] have mutually agreed upon visitation." According to Crouch's affidavit, Elizabeth said she sees her children once or twice a month. Crouch recounted the details of her interviews with the two girls, which if true, would constitute inappropriate sexual contact between William and his girls, as the girls alleged that he had been repeatedly forcing them to perform oral sex on him.

On July 23, 2001, the juvenile court placed the children with the Department "for placement in foster care or other appropriate placement" due to exigent circumstances such that efforts need not be made to prevent or eliminate the need for the removal of the children from the custodial home. The court's order of July 23 was apparently done ex parte off the record and makes no mention of Elizabeth. It did, however, order a further hearing for July 30.

A summons was issued by the juvenile court for service on William, but on August 2, 2001, the return was filed showing no service as William was not found in Douglas County. Subpoenas were issued to Department employees for the "detention hearing" set for July 30. The detention hearing was held on that date, and Elizabeth appeared with counsel. While William was not present, and had not been served, an attorney representing him made a special appearance on his behalf, but the court nonetheless specifically found in its order from that hearing that "notice, service and the jurisdiction of the Court in this matter are proper." Curiously, the next paragraph of the court's order recites that William had not been served. In any event, at the beginning of this hearing, counsel for Elizabeth advised the judge of their intention "to file an application to intervene," as well as the fact that there was a divorce decree in 1993 providing William with primary custody subject to Elizabeth's reasonable rights of visitation. However, counsel failed to introduce that decree into evidence at that time, or at any time in these proceedings. Counsel indicated that the motion to intervene would be filed on that day, and it was actually filed the following day, July 31.

At the July 30, 2001, hearing, Crouch testified that she interviewed the girls at "Project Harmony" on July 20 after they had disclosed the sexual assaults by William to Elizabeth and that Elizabeth had driven them there. Crouch testified that the reason the children were placed "into protective custody or foster care" was "[f]or their safety." Crouch was asked whether she was aware "of any other persons who would provide for their safety at the time that [she] placed them in protective custody." Her responses follow: "A: Their mother was present but did not have any legal custody at that time. Q: And were you aware of anything as it

relates to her living situation? A: I did not get into detail on her living situation."

Crouch related that William had been taken into custody on July 23, 2001, and that he had denied the allegations. Counsel for Elizabeth did not question Crouch, the only witness at the July 30 hearing, nor did he attempt to offer any evidence. The court found that it was in the best interests of the minor children to remain in the Department's temporary care and custody "with placement to exclude the home of the father until further order of the Court." The court then stated that the matter was set for a pretrial on August 21, at which point, Elizabeth's attorney asked whether the court would "entertain visitation for the mother at this time? Is that something the Court can do at this time?" The court's response is repeated here in full:

> I don't know anything about your client. I don't know any-
> thing about the overall situation except what I just heard.
> Your client is not a named party. She hasn't intervened yet.
> I'm not — I don't have any information to say that I would
> be opposed to it if the Department were to set it up, but
> absent something more being presented to me, I would not
> order that at this time.

The court's written order stemming from the July 30, 2001, hearing orders William, although he was not present at the hearing and had not yet been served, to "complete an affidavit of identification of the other parent of each minor child," and a setting was also made in that order for a hearing on August 21 on Elizabeth's motion to intervene. However, before that date, Elizabeth filed a motion for "detention review," which was heard on August 8. In her motion, she asked for immediate custody of her children.

At the beginning of the August 8, 2001, hearing on Elizabeth's "detention review," she was formally allowed to intervene. Then after some colloquy between the judge and Elizabeth's counsel about the burden of proof, Elizabeth testified. Elizabeth testified that she was the natural mother of the children and that she had custody pursuant to the recent district court order dated August 8, 2001, which was offered and received in evidence. Elizabeth testified that she lived in Omaha with her 8-year-old daughter and that she was in a position to

protect and provide for the needs and well-being of the three children involved in this proceeding. Elizabeth testified that she had secured a protection order against William to stay away from her and her residence and that she would call the authorities to enforce that order. She further testified that if the children were in her home, they would be allowed no contact with William. This concluded her direct examination.

Upon cross-examination, the State established that Elizabeth was living with a boyfriend, whom she had known for about 6 months. She was asked if she was aware if he had a police record and whether she was aware of any type of cruelty to animal charges against him, to which she answered in the negative on both matters. Counsel for the Department asked Elizabeth about her residence, and she responded it was a townhouse with two bedrooms and a full basement. She said she was employed at the University of Nebraska Medical Center as a research technician. When asked if she was aware of her boyfriend's being incarcerated for any reason, she said that she knew he was on work release but did not know what it was for and that "I didn't realize that was like he would have a criminal whatever because of being on work release." No evidence about the boyfriend was introduced nor was further evidence of any kind introduced. The juvenile court denied Elizabeth's motion for placement of the children with her and ordered the Department to undertake and complete a home study of Elizabeth to be available at the time of the "pretrial" on August 21.

Although Elizabeth filed her notice of appeal to this court on August 20, 2001, there was still a hearing of sorts on August 21. That hearing involved no evidence and no orders, but there was discussion about the status of the case and the home study. The court was aware that the appeal had been filed. Of note is the court's inquiry of the State as to whether service had been obtained on William, and the court was informed that he had not been served.

## JURISDICTION

Elizabeth's notice of appeal states that she is appealing from the juvenile court's orders of "July 30, 2001, and August 10, 2001." (We presume she means the order signed August 8 and

file stamped August 9.) The State contends that we lack jurisdiction because the order of August 9 continuing temporary custody of the three children in the Department and denying Elizabeth's request for custody or visitation with her children does not affect a substantial right of Elizabeth and thus is not a final, appealable order. The procedural framework here is an ex parte detention order of July 23, an evidentiary hearing and order of July 30 continuing detention in the Department, and an evidentiary detention hearing on August 8, after which Elizabeth's request for custody of her children was denied. The order of August 9 continued the Department's custody of the children. All of the foregoing were prior to any adjudication of the children.

Although an ex parte temporary detention order keeping a juvenile's custody from his or her parent for a short period of time is not final, an order under Neb. Rev. Stat. § 43-254 (Cum. Supp. 2000) and § 43-247(3)(a) after a hearing which continues to keep a juvenile's custody from the parent pending an adjudication hearing is final and thus appealable. See *In re Interest of R.R.*, 239 Neb. 250, 475 N.W.2d 518 (1991). See, also, *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991). In *In re Interest of Borius H. et al.*, 251 Neb. 397, 558 N.W.2d 31 (1997), the court said that unlike a detention order after a hearing, an ex parte temporary detention order keeping a juvenile from his or he parent is not final. Here we have orders of July 30 and August 9, 2001, both entered after hearings which continued the children's detention with the Department. The order of August 9 also denied Elizabeth's request for custody. The order of August 9 is a final, appealable order, and we have jurisdiction.

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings; however, where the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over another. *In re Interest of Kelley D. & Heather D.*, 256 Neb. 465, 590 N.W.2d 392 (1999). There is no conflict in the evidence here. In connection with questions of law, an appellate court has an obligation to reach an independent

conclusion irrespective of the decision made by the court below. *Kratochvil v. Motor Club Ins. Assn.*, 255 Neb. 977, 588 N.W.2d 565 (1999).

## ASSIGNMENTS OF ERROR

Elizabeth assigns 11 errors. We will not repeat each, but, rather, we use categories of assignments as logical divisions in our opinion, noting that there is a fair degree of overlap in the assignments. Elizabeth's claim can be summarized as being that she has been deprived of the right to have custody of her children by a juvenile court which has wrongfully imposed the burden of proof upon her to demonstrate her parental fitness when there are no allegations or evidence of her unfitness to have custody of her children and that the district court which entered her divorce decree has awarded her custody, in view of the allegation of sexual abuse against William. We have not found a similar Nebraska case.

## ANALYSIS

*Jurisdiction of Juvenile Court Versus District Court.*

Elizabeth attacks the jurisdiction of the juvenile court upon numerous grounds in her assignments of error, including the juvenile court's (1) failure to serve William, (2) failure to advise her of her rights, (3) lack of allegations against her, (4) failure to allow Elizabeth to participate in the initial custody hearing, and (5) failure to defer to the district court's order granting her sole custody of the children.

Elizabeth argues that the juvenile court lacked jurisdiction over the children, citing *In re Interest of Kelly D.*, 3 Neb. App. 251, 526 N.W.2d 439 (1994). At the outset, *In re Interest of Kelly D.* is distinguishable, because factually, it is the reverse of this case as it involved allegations against the noncustodial mother, but no allegations were made that the children lacked proper parental care because of the custodial father's actions or inactions. The *In re Interest of Kelly D.* court said the basic issue was what authority does a juvenile court have when a child's custodial parent is properly caring for the child but the noncustodial parent has propensities which pose a risk to the child and there is no allegation or evidence that the custodial parent is unwilling and unable to protect that child from the other parent.

■ In *In re Interest of Kelly D.*, an adjudication had already occurred from which no appeal had been taken, and the case was at the dispositional phase, which is completely different from the instant case. Despite the lack of an appeal from the adjudication order in *In re Interest of Kelly D.*, we raised on our own whether subject matter jurisdiction was present, noting that if the pleadings and the evidence do not justify the court's acquiring jurisdiction of a child, then the court has no jurisdiction, citing *In re Interest of D.M.B.*, 240 Neb. 349, 481 N.W.2d 905 (1992) (without jurisdiction juvenile court has no power to order parent to comply with rehabilitation plan, nor does juvenile court have any power over parent or child at disposition hearing). In *In re Interest of Kelly D.*, we found a lack of jurisdiction and ordered the proceedings dismissed, reasoning as follows:

> [T]he petition contains no allegations claiming that the child lacked proper parental care by reason of the conduct of [the father], the person having custody of the child. The pleadings therefore show that [the father] was given no notice of any claim against him or of the fact that the proceeding might interfere with his constitutionally protected rights to his child. . . . In this case, we conclude that the petition must allege facts which would show that the child lacks proper parental care by reason of the inadequacy of any parent whose custody or right to custody might be affected, so that both parents may understand that the litigation concerns their respective rights. Under the circumstances of this case, the petition is so fundamentally inadequate that it could not be the basis of the juvenile court's jurisdiction.

3 Neb. App. at 262-63, 526 N.W.2d at 447.

*In re Interest of Constance G.*, 247 Neb. 629, 529 N.W.2d 534 (1995), holds that the dual purpose of proceedings brought under § 43-247(3)(a) which allege that the juvenile is homeless, destitute, or without proper support through no fault of the parent, guardian, or custodian is to protect the welfare of the child and to safeguard the parent's right to properly raise his or her own child. Thus, a petition thereunder is brought on behalf of the child, not to punish the parents. *Id.*

■ The same is true in the instant case, even though the allegations are under the portion of § 43-247(3)(a) where the child

"lacks proper parental care by reason of the fault or habits of his or her parent." The specific claim here is the sexual abuse of the girls by William. Section 43-247 provides that the "juvenile court shall have exclusive original jurisdiction as to any juvenile defined in . . . subdivision (3) of this section." The jurisdiction of the State in juvenile cases arises out of the power every sovereignty possesses as parens patriae to every child within its borders to determine the status and custody that will best meet the child's needs and wants. *In re Interest of M.B. and A.B.*, 239 Neb. 1028, 480 N.W.2d 160 (1992).

From the foregoing authority, we reject Elizabeth's contention that our previous decision in *In re Interest of Kelly D.*, 3 Neb. App. 251, 526 N.W.2d 439 (1994), mandates a finding that the juvenile court lacked jurisdiction to make any orders with respect to the three children. Section 43-247 gives the juvenile court exclusive original jurisdiction of the allegations made under subsection (3)(a), as they were here. And the Department must obviously have an opportunity to prove its allegations. The difference between *In re Interest of Kelly D.* and the instant case is that in *In re Interest of Kelly D.*, the risk of harm was posed by the noncustodial mother and there were no allegations of a lack of proper parental care by the custodial father. Plus, in *In re Interest of Kelly D.*, the State had already put on its case, and an adjudication had occurred.

In the instant case, assuming the truth of the allegations of William's sexual abuse of the girls for purposes of analysis, the juvenile court would obviously have jurisdiction to remove the children from his custody. The filing of the petition on July 23, 2001, making those allegations against William gives the juvenile court jurisdiction to adjudicate the children.

While Elizabeth makes additional jurisdictional arguments relying on cases which exclude a noncustodial parent from neglect proceedings, such as *In re Interest of Amanda H.*, 4 Neb. App. 293, 542 N.W.2d 79 (1996), the record does not show that Elizabeth was excluded because she was allowed to intervene on August 8, 2001, and was then a party to the action.

Elizabeth also claims error because the juvenile court failed to defer to the district court's order of August 8, 2001. The order entered by the district court for Douglas County recites a hearing

upon the "ex parte motion of [Elizabeth] for custody of the parties' three (3) minor children," which was granted. We note that Neb. Rev. Stat. § 43-245(5) (Cum. Supp. 2000) provides in part: "Nothing in the Nebraska Juvenile Code shall be construed to deprive the district courts of their habeas corpus, common-law, or chancery jurisdiction or the county courts and district courts of jurisdiction of domestic relations matters as defined in section 25-2740." Neb. Rev. Stat. § 25-2740 (Cum. Supp. 2000) includes "custody" within the definition of the term "domestic relations matters." Notwithstanding this statutory provision giving the district court jurisdiction over custody in a domestic relations matter, the jurisdiction of the State in juvenile cases arises out of the power every sovereignty possesses as parens patriae to every child within its borders to determine the status and custody that will best meet the child's needs and wants. *In re Interest of M.B. and A.B., supra.* Therefore, the district court's grant of custody to Elizabeth was important and should have been considered by the juvenile court in ruling on her motion for placement of the children with her, because the district court order negated Crouch's affidavit to the extent that it claimed that Elizabeth had no right of custody. However, the juvenile court was not bound to give the district court order preclusive effect, because the sovereign exercises its parens patriae power primarily through the juvenile courts, which do not need to defer to prior district court orders. See *Schleuter v. McCuiston,* 203 Neb. 101, 277 N.W.2d 667 (1979) (juvenile court still has jurisdiction to determine custody of minor child whose custody was subject to preexisting district court custody order when county attorney proceeds under juvenile code with filing allegation child falls with § 43-247(3)).

### *Ex Parte Detention Order and Misleading Affidavit.*

■ Elizabeth claims that the State gained temporary emergency custody of her children by using a false and misleading affidavit from Crouch. Clearly, ex parte temporary custody of an endangered juvenile by a law enforcement officer is statutorily authorized. See Neb. Rev. Stat. § 43-248 (Reissue 1998). The grounds for an ex parte detention order from the juvenile court are to be contained in an affidavit of one having knowledge of the relevant facts to be presented to the juvenile court and made a part

of the record of the proceedings. *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991). The record in this case reveals that these procedural steps were followed, and we reject Elizabeth's contention that as a legal matter, the juvenile court was without authority to enter an ex parte temporary detention order.

Elizabeth also contends that Crouch's affidavit was false in its assertion that "there was no appropriate person for the undersigned to release said child(ren) which could provide for said child(ren)'s temporary care and safety." Crouch's affidavit also stated that Elizabeth "does not have any legal custody rights at the time of th[is] report." No factual basis for either of these conclusions is found in the affidavit. Moreover, this same police officer testified at the first detention hearing on July 30, 2001, when asked about her awareness of Elizabeth's living situation: "I did not get into detail on her living situation." Crouch's sworn statement that there was "no appropriate person" to whom she could release the children, remembering that Elizabeth had brought the children to the police, suggests that after appropriate investigation, Elizabeth has been determined by Crouch to be an inappropriate temporary custodian of her own children. The fact of the matter, as revealed by Crouch's testimonial admission, is that she did nothing to determine the appropriateness of temporary placement of the children with Elizabeth.

When Crouch represented that Elizabeth "does not have any legal custody right," no factual basis for that statement was provided in the affidavit, and as discussed above, by August 8, 2001, Elizabeth was given custody by the district court order which negated Crouch's earlier statement. The affidavit was inaccurate to the extent that it implied that Crouch had investigated whether placement with Elizabeth was appropriate. But in any event, it had been negated by the district court's order. In conclusion, the affidavit, while providing the basis for the juvenile court to initially enter an order of temporary custody, provided no basis on August 8 for the juvenile court to deny Elizabeth's motion that the children be placed with her.

*Deprivation of Custody Without Evidence of*
*Unfitness or Inability to Protect Children.*

Elizabeth's brief uses a variety of assignments of error to argue that she was wrongfully denied custody of her children

when the allegations of their endangerment by William's sexual abuse of the girls came to light.

We begin with Elizabeth's contention that the juvenile court wrongfully placed the burden of proof upon her in the detention review hearing of August 8, 2001. In that proceeding, the juvenile court asked counsel for Elizabeth if he was asking that the children be placed with her. Upon being advised in the affirmative, the court asked if there was "objection to that." The attorneys for the State and the Department both objected without stating any basis, nor did the court require them to articulate any reason for their objections. The court then informed Elizabeth's counsel: "All right. So then you need to present evidence." At that point, Elizabeth testified, and we have recounted the substance of her testimony in the factual background portion of this opinion.

■ We hold that the burden is upon the State to allege and prove in a detention hearing that the juvenile court should not place children with their other natural parent after the expiration of the first 48 hours of emergency detention under Neb. Rev. Stat. § 43-250(4) (Cum. Supp. 2000) during a period of temporary detention pending adjudication spawned by allegations under § 43-247(3)(a) against their custodial parent. The rationale for our holding begins with *In re Interest of Borius H. et al.*, 251 Neb. 397, 402, 558 N.W.2d 31, 35 (1997), which holds that parents have a recognized liberty interest in raising their children and the removal of a child "from his or her parent without *any* evidence whatsoever is clearly violative of this liberty interest and will not be tolerated." In *In re Interest of Borius H. et al.*, the children were removed from their mother's possession solely on the filing of a petition without an affidavit, and 2 weeks later, the juvenile court continued the detention of the children, still without receiving any evidence to support the allegations against the mother. This was found to be a denial of due process. In *In re Interest of Borius H. et al.*, there were at least allegations against the mother—but in the present case, the juvenile court did not even require the State or the Department to state a reason for their objection to Elizabeth's having custody before wrongfully imposing the burden of proof on her.

■ Additionally, as part of our rationale, we recall that the parent-child relationship is afforded due process protection. *In*

*re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992). The U.S. Supreme Court in *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981), has said that due process has not been and perhaps can never be precisely defined as it does not have a fixed content unrelated to time, place, and circumstance, but, rather, it expresses the requirement of "fundamental fairness." *In re Interest of L.V., supra*, teaches that when a person has a right to be heard, procedural due process includes notice reasonably calculated to inform the person of the subject and issues involved in the proceeding, a reasonable opportunity to refute or defend against the charge or accusation, and a reasonable opportunity to confront and cross-examine adverse witnesses. Due process is a flexible notion which calls for such procedural protections as the particular situation demands. *Marshall v. Wimes*, 261 Neb. 846, 626 N.W.2d 229 (2001).

In short, due process is contextual. The context revealed by the record before us is of a mother who was informed that her two minor daughters were being sexually abused by her ex-husband, the custodian of their three children. She immediately contacted police and took them to a place where they could be interviewed by an officer. That officer admitted to making no investigation to determine whether the mother was a suitable person with a suitable place for the children to be in temporary detention, even though she knew that the mother was having visitation when the children made the disclosure of sexual abuse by the girls' custodial father, which triggered these proceedings. A juvenile petition was filed seeking adjudication of the children, and an order of emergency detention was entered on July 23, 2001. The petition made no allegations against the mother. The juvenile court had a detention hearing on July 30 and then again on August 8, this time upon the mother's motion seeking to gain custody of her children, and the district court had made her the custodial parent by that point. The juvenile court wrongfully imposed the burden of proof upon the mother, when neither the State nor the Department had made any allegation whatsoever that the mother was unfit to have custody of her children or could not protect them from her ex-husband. Fundamental fairness demands that in a situation such as this, the mother be given prompt notice of

any allegations against her which the State or the Department contends make placement of her children with her contrary to the children's best interests. And, the burden of proof of such allegations is upon the State.

The State, while paying lip service in its brief to Elizabeth's constitutional right to the companionship, care, custody, and management of her children, claims as apparent justification for its denial of Elizabeth's right to due process, that Elizabeth was "ignorantly and recklessly living with a man whom she admitted she'd only known for 6 months and who had a criminal record." Brief for appellee at 15. The State proved nothing about the man with whom Elizabeth was living, including nothing that would allow a reasonable inference that the children should not be around him.

The State's position, revealed by the above quote and its cross-examination of Elizabeth, seems to be that the juvenile court, as well as this court, should take some sort of "judicial notice" that a man on work release is dangerous to children, and a woman is ignorant for living with him, even though the State offered no evidence of what it was about this man that would make these statements true. Due process requires more. In this case, due process requires notice of specific allegations against Elizabeth with proof thereof by the State. Both things are missing from this record.

Our third rationale for our holding is that the placement of a child in the custody of one parent as opposed to the other in a divorce action does not extinguish the noncustodial parent's right to custody, nor does it constitute an adverse determination of the fitness of the noncustodial parent in that or other proceedings. *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996). *In re Interest of Amber G. et al.* explains that a petition under § 43-247(3)(a) is brought on behalf of the child and that the purpose of the adjudication phase of a juvenile proceeding is to protect the interests of the child, whereas the purpose of the dispositional phase is to determine placement and the rights of the parties in the action. The *In re Interest of Amber G. et al.* court said that in the adjudication phase, the question was whether the children lacked proper parental care while in the custody of their mother and that the "question of whether the

father was fit or unfit to have custody did not arise and *should not have arisen until the dispositional phase.*" (Emphasis supplied.) 250 Neb. at 981, 554 N.W.2d at 148. This statement is dicta given that the issue of placement with the father had not been raised until the dispositional phase and that thus, whether placement with a noncustodial parent could be raised preadjudication was not necessary to the court's decision.

Nonetheless, our opinion here would not be complete without acknowledging that some might read *In re Interest of Amber G. et al.* as authority for the proposition that Elizabeth's request for custody is premature because she seeks custody of her children before there has been an adjudication. But we find that the statement under discussion from *In re Interest of Amber G. et al.*, which was repeated in *In re Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 598 N.W.2d 729 (1999), is not determinative in this appeal because it is dicta made in a completely different factual context from here. In *In re Interest of Kantril P. & Chenelle P.*, the custodial mother attacked the juvenile court's jurisdiction on the ground that the petition contained no allegations against the noncustodial father, but the father was not a litigant actively seeking custody. And, the *In re Interest of Kantril P. & Chenelle P.* court noted that the father played "no role in [the children's] living situation at the time they were taken into foster care." 257 Neb. at 458, 598 N.W.2d at 736. The record in the instant case shows that Elizabeth was involved with her children, that she actively exercised visitation, and that she had been given custody by the district court on August 8, 2001, all of which make for a markedly different situation from *In re Interest of Kantril P. & Chenelle P.*

Returning to *In re Interest of Amber G. et al., supra,* we note that it was an appeal after disposition where the appealing father was arguing that the juvenile court lacked jurisdiction for the adjudication of the children, given that there was no allegation that the factual basis which justified removal from the mother also justified the refusal to place the children with him. The court rejected that assignment, finding that the juvenile court properly took jurisdiction at the adjudication phase of the case. The father also contended that the dispositional phase of the proceedings involving abused or neglected juveniles under § 43-247(3)(a)

was unconstitutional because it did not require a determination of whether placement with the noncustodial parent is proper when return to the home of the custodial parent is contrary to the welfare of the child. He further argued that his due process rights were violated because the statute did not require the court to consider the homes of both parents in its placement decision.

The court in *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996), rejected these claims of unconstitutionality, noting that the juvenile court has broad jurisdiction under Neb. Rev. Stat. § 43-284 (Reissue 1993) to commit the juvenile to a suitable institution, to the care of a reputable citizen, to the care of a suitable family, or to the care and custody of the Department. See § 43-284 (Supp. 2001) (current version). However, in reasoning which is applicable to the instant case, the *In re Interest of Amber G. et al.* court noted that the discretion found in § 43-284 is not without limitation because of the parental preference doctrine which holds that in a child custody controversy between a biological parent and one who is neither a biological nor adoptive parent, the former has a superior right to custody of the child, citing *Stuhr v. Stuhr*, 240 Neb. 239, 481 N.W.2d 212 (1992). The *In re Interest of Amber G. et al.* court then said:

> A court may not properly deprive a biological or adoptive parent of the custody of the minor child unless it is *affirmatively shown* that such parent is unfit to perform the duties imposed by the relationship or has forfeited that right; neither can a court deprive a parent of the custody of a child merely because the court reasonably believes that some other person could better provide for the child.

(Emphasis supplied.) 250 Neb. at 982, 554 N.W.2d at 149.

The phrase "affirmatively shown" from *In re Interest of Amber G. et al.* is important, because in the instant case, there is absolutely nothing in this record remotely resembling an affirmative showing by the State that Elizabeth was not a fit parent or that she had forfeited her rights as a parent. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997), holds that in order to demonstrate that a preadjudication detention should continue, the State must prove by a preponderance of the evidence that the custody of a juvenile should remain in the care

of the Department pending adjudication. Here, the State neither alleged nor proved that Elizabeth should not have custody of her own children pending adjudication because placement with Elizabeth was "contrary to [the children's] welfare." See *id.* at 622, 558 N.W.2d at 555. See, also, *In re Interest of Gloria F.*, 254 Neb. 531, 577 N.W.2d 296 (1998) (holding that preadjudication detention orders are dispositional in nature and that § 43-254 requires State to prove by preponderance of evidence that custody should remain with Department pending adjudication). Here, the State offered nothing to support its unspecified "objections" to Elizabeth's having custody of her own children.

Finally, while we do not think that *In re Interest of Amber G. et al., supra,* and *In re Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 598 N.W.2d 729 (1999), hold that Elizabeth cannot assert her right to custody of her own children until after the allegations against William have been adjudicated, we find that the law has changed somewhat since those decisions. The 1998 Nebraska Legislature made changes to the Nebraska Juvenile Code by passing 1998 Neb. Laws, L.B. 1041, which included the enactment of Neb. Rev. Stat. § 43-283.01 (Reissue 1998), using new language expressly directed at foster placement: "[R]easonable efforts shall be made to preserve and reunify families prior to the placement of a juvenile in foster care." The court in *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002), observed that reasonable efforts to reunify the family have been an integral part of the juvenile code since 1981. However, it was not until L.B. 1041 in 1998 that the Legislature expressly put into law the requirement quoted above from § 43-283.01(2) specifically mentioning foster care. Prior thereto, the Legislature in 1981 Neb. Laws, L.B. 346, had used language directing the construction of the juvenile code to accomplish certain purposes including a "safe and stable living environment . . . in the juvenile's own home whenever possible, separating the juvenile from his or her parent when necessary for his or her welfare." Neb. Rev. Stat. § 43-246(1) and (5) (Reissue 1998). At the very least, we believe that L.B 1041 reaffirms the Legislature's view that children should not be put in foster care unless it is necessary to separate child and parent for the welfare of the child. The necessity of separating

Elizabeth from her children and placing them in foster care preadjudication was never alleged or proved.

The Legislature's mandate in § 43-283.01 that families be preserved and reunified before children are placed in foster care is at odds with any reading of *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996), that a noncustodial parent must wait until after an adjudication before he or she may seek custody of his or her children and that such parent must stand idly by while the children are placed in foster care pending an adjudication. In saying this, we cannot help but ask what better and more straightforward method of preserving families could there be, in circumstances such as this, than placement of the children with a fit and willing parent, even if that parent had previously been a noncustodial parent in a divorce. The procedures employed in the instant case are clearly at odds with the Legislature's most recent mandate found in § 43-283.01 as well as its mandate from 1981 found in § 43-246, all of which require reasonable efforts to maintain family integrity. This was not done here.

## RESOLUTION

Finding a denial of due process and no allegations or proof by the State that Elizabeth should not have custody of her children, we reverse the order of August 9, 2001, continuing placement of the children with the Department, and we direct the juvenile court to place the children with Elizabeth, pending adjudication of the allegations against William in the juvenile petition. Our decision and directions, however, do not preclude the State from coming forward, once the juvenile court reacquires jurisdiction of this cause upon receipt of our mandate, with allegations and proof that Elizabeth is not a fit custodial parent of her children.

REVERSED AND REMANDED WITH DIRECTIONS.