Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/05/2021 08:11 AM CST

In re Interest of A.A. et al., children
under 18 years of age.
State of Nebraska, appellee, v.
Joshua C. appellant.

___ N.W.2d ___

Filed November 20, 2020.    Nos. S-20-009, S-20-244.

1. **Jurisdiction: Appeal and Error.** A jurisdictional question that does not involve a factual dispute is a question of law that an appellate court resolves independently of the conclusions reached by the trial court.

2. **Constitutional Law: Due Process.** The determination of whether the procedures afforded to an individual comport with constitutional requirements for due process presents a question of law.

3. **Juvenile Courts: Evidence: Appeal and Error.** Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.

4. **Jurisdiction: Final Orders: Appeal and Error.** Under Neb. Rev. Stat. § 25-1911 (Reissue 2016), for an appellate court to acquire jurisdiction of an appeal, there must be a final judgment or final order entered by the tribunal from which the appeal is taken.

5. **Jurisdiction: Words and Phrases.** Subject matter jurisdiction deals with the court's ability to hear a case.

6. ____: ____. Subject matter jurisdiction is the power of a tribunal to hear and determine a case of the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.

7. **Juvenile Courts: Jurisdiction.** To obtain jurisdiction over a juvenile and the juvenile's parents, the court's only concern is whether the condition in which the juvenile presently finds himself or herself fits within the asserted subsection of Neb. Rev. Stat. § 43-247 (Reissue 2016).

8. **Constitutional Law: Due Process: Parent and Child.** The relationship between parent and child is constitutionally protected and cannot be affected without procedural due process.

9. **Due Process.** The concept of due process embodies the notion of fundamental fairness and defies precise definition.

10. ____. Due process is flexible and calls for such procedural protections as the particular situation demands.

11. **Constitutional Law: Parent and Child.** The mere existence of a biological link does not merit substantial constitutional protection; rather, the parental liberty interest in a child stems from the more enduring relationship developed upon a biological parent's commitment to the responsibilities of parenthood.

12. **Constitutional Law: Due Process: Parent and Child.** An unwed biological father who has grasped the opportunity to establish a familial relationship with his biological child has an interest in personal contact with his child, which interest is given substantial protection under the Due Process Clause of the 14th Amendment.

13. **Parental Rights.** When parental control fails, the State must play its part as parens patriae.

14. ____. The rights of parenthood, even of a fit parent, are not beyond limitation by the State's powers and duties as parens patriae.

15. ____. Where a child is cared for by a fit parent, the State's interest in caring for the child is de minimis.

16. **Parental Rights: Child Custody.** Only the paramount interest which the public has in the protection of the rights of the child can subjugate the rights of parents to maintain custody of their children.

17. ____: ____. The parental preference doctrine holds that in a child custody controversy between a biological parent and one who is neither a biological nor an adoptive parent, the biological parent has a superior right to the custody of the child.

18. **Parental Rights: Child Custody: Presumptions.** Under the parental preference doctrine, unless the State affirmatively shows a parent is unfit or has forfeited the right to custody, due regard for the parent's natural right to the custody of a child requires that a parent be presumptively regarded as the proper guardian.

19. **Parental Rights: Child Custody: Proof.** Only exceptional circumstances involving proof of serious physical or psychological harm to the child or a substantial likelihood of such harm will negate the superior right of a fit parent who has not forfeited parental rights to custody under the parental preference doctrine.

20. **Juvenile Courts: Jurisdiction: Child Custody: Proof.** When the allegations of a petition for adjudication invoking the jurisdiction of

the juvenile court are against one parent only, the State cannot deny the other parent's request for temporary physical custody in lieu of a foster care placement unless it pleads and proves by a preponderance of the evidence that the other parent is unfit or has forfeited custody or that there are exceptional circumstances involving serious physical or psychological harm to the child or a substantial likelihood of such harm.

21. **Parental Rights: Child Custody.** Because parental preference derives not simply from biology but from the enduring relationship developed upon a biological parent's commitment to the responsibilities of parenthood, children removed from their homes due to the fault or habits of one parent need not immediately and without some minimal investigation be placed with the other biological parent whose status as having an actual relationship of parental responsibility is unknown.

22. **Juvenile Courts: Jurisdiction: Parental Rights: Child Custody.** The nonoffending parent's exercise of the parental preference of custody is not entirely unfettered during the juvenile court's continuing jurisdiction under the juvenile code.

23. **Juvenile Courts: Parental Rights.** The juvenile court, in the exercise of its parens patriae responsibilities, may develop a transition plan constituting a reasonable intrusion of limited duration into the nonoffending parent's rights to autonomy in the care and custody of the child.

24. **Juvenile Courts: Due Process: Parental Rights: Child Custody.** It does not violate due process for the juvenile court in its determination of the child's best interests and in its role as adjudicator of the custody rights between two parents to require the nonoffending parent's cooperation with goals of reunification back into the home from where the child was taken.

25. **Due Process: Notice.** Procedural due process generally requires that notice be given of such a nature as to reasonably convey the required information.

26. **Parental Rights: Child Custody: Notice.** In the context of denying parental preference in a placement decision during proceedings under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), reasonable notice must include the factual bases for seeking to prove that the parent is unfit or has forfeited parental rights or that exceptional circumstances exist involving serious physical or psychological harm to the child or a substantial likelihood of such harm.

27. ____: ____: ____. Allegations as to the fault or habits of the custodial parent do not operate to give notice to the noncustodial parent that the State seeks to rebut that parent's right to parental preference in its placement decisions.

28. **Handicapped Persons: Parent and Child: Parental Rights: Presumptions.** There is no presumption that a disabled parent is unfit, that a disabled parent has forfeited parental rights, or that exceptional circumstances exist involving serious physical or psychological harm to the child or a substantial likelihood of such harm because a parent is disabled.

29. **Handicapped Persons: Parent and Child: Presumptions.** The simple fact that a parent is disabled does not overcome the presumption that the parent is a better caretaker of the parent's own child than the State is.

30. **Juvenile Courts: Jurisdiction: Final Orders: Appeal and Error.** A juvenile court is not wholly divested of jurisdiction during the pendency of an appeal from a final order.

31. **Courts: Juvenile Courts: Jurisdiction: Appeal and Error.** The extent of the continuing jurisdiction of the separate juvenile courts and the county courts sitting as juvenile courts during the pendency of an appeal is not without limits and must be determined by the facts of each case.

32. **Juvenile Courts: Jurisdiction: Parental Rights.** The juvenile courts' continuing jurisdiction does not include the power to terminate a juvenile's relationship with the child's parents.

33. **Judges: Recusal: Time.** The issue of judicial disqualification is timely if submitted at the earliest practicable opportunity after the disqualifying facts are discovered.

34. **Judges: Recusal: Presumptions.** There exists a presumption of judicial impartiality, and a party alleging that a judge acted with bias or prejudice bears a heavy burden of overcoming that presumption.

35. **Judges: Recusal.** A judge's opinions based on facts presented during a hearing, even if those opinions are stated before the hearing's conclusion, are not indicative of bias by the judge unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

Appeal from the Separate Juvenile Court of Lancaster County: Reggie L. Ryder, Judge. Judgment in No. S-20-009 reversed, and cause remanded with directions. Judgment in No. S-20-244 affirmed.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Douglas J. Peterson, Attorney General, C.J. Roberts, Special Assistant Attorney General, and Patrick Condon, Lancaster County Attorney, and Haley N. Messerschmidt for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. NATURE OF CASE

Upon allegations that the mother had endangered her 6-year-old child who was living with her, the Nebraska Department of Health and Human Services (DHHS) was given temporary legal and physical custody of the child and his half siblings, who were placed together in temporary foster care. No allegations were made against the child's legal father, who did not at that time live with the child and did not have notice of the hearing on temporary custody. There was an acknowledgment of paternity, and the father had lived with and helped support the child and his mother for approximately 5 years up until the father developed Guillain-Barre syndrome approximately 7 months before the petition for adjudication was filed. After the father became aware that his child was in foster care, he moved for temporary physical placement, which the juvenile court denied. The court reasoned that the father was "unfit" for placement at that time due to his unwillingness to cooperate with DHHS in forming a placement plan that addressed concerns stemming from a physical disability.

In case No. S-20-009, the father appeals the denial of his motion for placement, arguing that the State did not sustain its burden to affirmatively prove him unfit by a preponderance of the evidence before depriving him of his fundamental liberty and privacy interests in caring for and guiding his child without undue interference. He also challenges the jurisdiction of the juvenile court based upon filing dates and scrivening details pertaining to the ex parte order removing the children from the mother's home. While his appeal in case No. S-20-009 was pending, the court proceeded with adjudication of the child over the father's objection. In the appeal in case No. S-20-244, the father argues that his appeal in case No. S-20-009 divested the juvenile court of jurisdiction to issue the adjudication order.

## II. BACKGROUND

Joshua C., the legal father of B.C., appeals in case No. S-20-009 from the juvenile court's order denying his motion for temporary physical placement of B.C. in his home pending the adjudication of B.C. under a petition making allegations of endangerment by the mother. In case No. S-20-244, Joshua appeals from the court's subsequent order adjudicating B.C. due to the fault or habits of B.C.'s mother. We have consolidated the two cases, Nos. S-20-009 and S-20-244, for purposes of oral argument and disposition.

### 1. October 14, 2019, Ex Parte
### Emergency Temporary Order

#### (a) Motion

On October 14, 2019, a Monday, a motion for an ex parte order for emergency temporary custody was file stamped in the separate juvenile court of Lancaster County. Three children, A.A., M.A., and B.C., were listed in the caption. In the motion, the county attorney asserted that "the above-named juveniles are endangered in such conditions or surroundings that the juveniles' welfare and best interest require immediate removal."

The affidavit in support of the motion, dated October 11, 2019, listed in its caption four children, D.W., A.A., M.A., and B.C.

In the affidavit, Officer Jarid Freyermuth stated that on October 11, 2019, he was dispatched on a report of "belated child neglect" in Lincoln, Nebraska. D.W., age 12, had reported that his mother had threatened him with a steak knife an hour prior, during the course of an argument about not properly storing an open bag of hotdogs. The mother had reportedly cornered D.W. while armed with the knife and, when he put his hands on her upper chest area to defend himself, placed the tip of the knife on his shoulder and said, "'[I]f you touch me I'll stab your hands.'"

Freyermuth reported that D.W.'s siblings, A.A., M.A., and B.C., corroborated D.W.'s description of the incident and that the mother ultimately admitted to arming herself with the knife and threatening D.W. Freyermuth reported that she denied, however, "touching D.W. with the knife even when faced with the fact that D.W. had an injury resembling being touched with the knife."

According to the affidavit, D.W. was turned over to his father, while an employee of DHHS took emergency custody of the other three children. The mother was taken to jail on October 11, 2019, upon charges of felony child abuse, terroristic threats, and use of a weapon to commit a felony.

Freyermuth averred that the children were in such condition or surroundings that their welfare required the court to assume temporary custody immediately by endorsement upon the summons or separate order directing that the children be taken into custody at once, with proper arrangements being made for their temporary custody and care pending a hearing on a petition.

(b) Order

The juvenile court signed an ex parte order for emergency temporary custody on Saturday, October 12, 2019. The order was not file stamped until Monday, October 14.

The caption for the order listed A.A., M.A., and B.C. D.W. was not named in the caption. The order described that pursuant to Neb. Rev. Stat. § 43-248(2) (Cum. Supp. 2018), the "above-named juveniles' needs require that they be taken into emergency custody and placed with [DHHS]."

Pursuant to the ex parte order, a temporary custody hearing was scheduled for October 16, 2019. Notice of the hearing was to be sent to the parents and guardians identified in the affidavit. Joshua was not identified.

The court found in the ex parte order that DHHS could, at its discretion, return the children home pending the placement hearing. The ex parte order was to expire if the county

attorney failed to file a petition by October 15, 2019, at 4:30 p.m. A guardian ad litem was appointed.

## 2. October 14, 2019, Petition

A petition was filed in juvenile court on Monday, October 14, 2019, at approximately 4 p.m. All four children, A.A., M.A., B.C., and D.W., were named in the caption. The petition alleged that A.A., M.A., B.C., and D.W. were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), by reason of the fault or habits of their mother, or that they were in a situation injurious to life or limb or their health or morals, based on the incident on October 11 in which she threatened one of them with a knife. The adjudication was based on no other events. No allegations were made against Joshua.

While the alleged father of D.W. was listed in the petition as a person to be served with a summons, no other father was identified. Likewise, only the father of D.W., and the children's mother, were identified in the praecipe for summons, dated October 17, 2019, to be served with copies of the petition. The record does not reflect that the court published notice, because a parent's name was unknown, as provided for in Neb. Rev. Stat. § 43-268 (Reissue 2016).

## 3. October 17, 2019, Temporary Custody Order

A hearing on the motion for temporary custody was held on October 16, 2019. Neither Joshua nor his counsel was present. The appellate record does not contain a transcription of the October 16 hearing.

In an order on October 17, 2019, the court found that although DHHS was making reasonable efforts to eliminate the need for out-of-home placement, remaining in the home at that time would be contrary to the children's health, safety, and welfare, and that it was in their best interests to remain in out-of-home placement. The court ordered that temporary legal and physical custody remain with DHHS. The mother was

given reasonable rights of supervised parenting time so long as she was not in custody.

Only A.A., M.A., and B.C. were listed in the caption for the order of temporary custody. Joshua was not served with a copy of the order.

### 4. Joshua's Intervention and Request for Placement on October 30, 2019

On October 30, 2019, Joshua, through his attorney, filed a motion for leave to intervene and for immediate placement of B.C. with him. In the motion, Joshua alleged that he was B.C.'s biological father and that with the exception of a 1-year separation from B.C.'s mother, from B.C.'s birth in August 2013 until July 2019, B.C. and his mother had lived with Joshua, during which time Joshua had provided continuous care and support for B.C.

Joshua did not explain when he received actual notice of the juvenile proceedings relating to B.C. Joshua described only that on or about October 29, 2019, a DHHS employee had informed him that DHHS would not consider placing B.C. in his care and custody.

Joshua did not in the motion challenge the prior orders of the court on due process or any other grounds. He did not move for legal custody.

Hearings on the motion were held on November 21 and December 23, 2019.

### (a) November 21, 2019, Hearing

At the November 21, 2019, hearing, Joshua testified that he has lived for approximately 8 years in Superior, Nebraska, where he owns a four-bedroom house in the center of town. Joshua testified that he was in a romantic relationship with B.C.'s mother from approximately July 2012 until July 2019. During that time, they conceived B.C., who was born in August 2013. Joshua testified that he had signed an acknowledgment of paternity but had forgotten to bring it to the

November 21 hearing. There was no evidence of an adjudication of custody rights between the two parents.

B.C. and B.C.'s mother lived with Joshua during the entirety of their relationship with the exception of a year when she and B.C. had moved out, 2 or 3 years before the hearing, and then moved back in.

Joshua described that in late February 2019, he developed Guillain-Barre syndrome. He was hospitalized for a month and then spent approximately 6 months in rehabilitation centers until returning home in September. It was during his illness that his relationship with B.C.'s mother ended.

At the time of the hearing, Joshua had been home for approximately 2 months. B.C. visited Joshua 5 to 10 times while Joshua was residing at rehabilitation centers. Joshua testified that he had seen B.C. only twice since returning home, during two weekend visits arranged with B.C.'s current placement caretaker.

Joshua lives alone, but has a 15-year-old child who stays with him every Wednesday overnight and every other Thursday through Sunday.

As of the time of the hearing, Joshua was still unable to get around without a wheelchair. He had the aid of home health care in the mornings. He was unable to fully sit himself up in his wheelchair without assistance. Before developing Guillain-Barre syndrome, Joshua worked as a pipewelder. Since his illness, he has relied on Social Security disability payments. Joshua testified that he was financially able to provide for B.C. Joshua did not believe his physical limitations impaired his ability to properly parent or supervise B.C.

Joshua testified that his grandfather had agreed to take B.C. to and from school. The school bus stopped only "three blocks away." Joshua could also reach out to his mother, if she was not working, as well as to "[f]riends and just people in the community," for school transportation. Joshua named a couple of people who had volunteered to help. Joshua explained that

the transportation company he uses would be able to transport B.C. to any appointments.

As far as feeding B.C., Joshua testified that "[t]here's the local grocery store and then there's the Dollar General." Joshua testified that he was not yet cooking any of his own meals, but that his mother, his grandfather, and the aides had all said they would be willing to prepare meals for B.C. Alternatively, he could order takeout or delivery.

Joshua described a nightly routine for B.C. that would involve homework, television, showering, and brushing teeth. He did not foresee its being a problem that he generally did not have assistance overnight.

Joshua said that DHHS had been in contact with him about a placement plan. There had been some discussion about placing B.C.'s half siblings with Joshua as well. Joshua was willing to serve as such a placement.

The plan that was developed was originally going to involve having Joshua's mother stay overnight. At that time, his mother was spending the night in Joshua's home to help care for him. She had been staying the night at Joshua's house from the time of his return from the rehabilitation centers up until approximately 2 weeks before the November 21, 2019, hearing. Joshua explained that as of early November 2019, his mother no longer wished to stay overnight. Joshua did not reach out to notify DHHS that his mother would no longer be staying the night, but confirmed that was true when DHHS called and asked.

Joshua testified that he was willing to have a conversation with DHHS about any logistical concerns of how to address emergencies or other childcare issues that might arise in the middle of the night. Joshua conceded that he had refused to sign a medical release to allow DHHS to review his medical records relating to his Guillain-Barre syndrome prognosis, explaining, "I'm just not prepared to do it right now, okay."

At the close of the day on November 21, 2019, the court noted that the hearing would be continued in order to allow

the parties to present additional evidence. The court told Joshua that he had "come a long way." The court stated that it needed to see the acknowledgment form. The court continued to explain that, also, "we need to make sure there's a plan," elaborating:

[W]e've talked about evenings. We haven't talked about weekends when he's not in school. We haven't talked about a snow day that we're probably going to have. We haven't talked about two or three weeks of not being in school during Christmas. We've got to make sure we've got a plan. It sounds like you've thought about it a little bit but I'd want to make sure before I'm going to say he's in your care, that we've got a daily consistent plan and schedule. Who's going to be coming over. Who can we call at 2:00 in the morning if he has a nose bleed, a fever. If he falls out of bed. If he's scared and I understand you would like to be there and right now you're limited on doing that. So we've got to make sure we've got a safe and smart plan . . . . I've got to make sure we've got, you know, a plan that's — that's really pretty much consistent. Who's going to be on call at 2:00 in the morning. Who's going to be there on the weekends. Who's going to be preparing the meals because on the weekends we've got breakfast, lunch, we've got dinner. And we've got snacks. We've got a lot of things that six year olds need help with so we'll certainly hear more about that at the next hearing[.]

(b) December 23, 2019, Hearing

At the continuation of the hearing on December 23, 2019, Joshua offered into evidence the acknowledgment of paternity containing the notarized signatures of both Joshua and B.C.'s mother in August 2013, which the court received. The exhibit reflects that the acknowledgment had been filed with DHHS as required by Neb. Rev. Stat. § 43-1408.01 (Reissue 2016). As soon as the acknowledgment was received, the

court orally pronounced that Joshua's motion to intervene was granted, and the only motion still pending was placement.

### (i) Joe Knott's Testimony

Joe Knott, an employee of DHHS, testified that an inspection of Joshua's home found it to be in appropriate condition and that DHHS had previously "ironed out a plan" with Joshua for placement of the children with him around November 4, 2019. That plan, however, had "deteriorated" by the time of the scheduled placement due to the sudden departure of Joshua's mother as an overnight caretaker. Accordingly, placement was delayed.

Knott checked in a few more times throughout that week to see if there had been any change in the situation. After a couple of conversations in which Joshua indicated nothing had changed, Knott was unable to reach Joshua. Knott testified that he "left voicemails trying to figure out a way that we could remedy the situation and kind of make sure that we had something that was in place so that it would allow us to move forward with placement, but I did not hear back from [Joshua]." At some point, B.C., A.A., and M.A. were placed together in another home.

Since the unsuccessful prior attempts at moving forward with placement with Joshua, communication between Joshua and DHHS had involved one conversation about the two visits with B.C. and B.C.'s half siblings facilitated by B.C.'s current placement and one conversation about "placement and things that we'd like to see." After that, Knott understood Joshua had "been advised by his attorney not to speak with us."

According to Knott, B.C.'s mother had indicated "she did not want any of her ex's to have placement of the children." This conversation apparently occurred after the November 21, 2019, hearing. She had originally told Knott that B.C. was "well bonded" with Joshua.

Knott described that if Joshua were willing to work with DHHS, DHHS would gather information about reasonable accommodations that Joshua would be making "in terms of

finding individuals that are willing [and] able to assist him with the placement to make sure that it can be done effectively, and that there's no safety concerns for [B.C.,] who's six years old." Knott opined that "just being able to identify those individuals that would be willing and able to help in certain situations I think would be very helpful and go a long way into helping us develop and firm up a plan." Knott noted that DHHS would want to run background checks on any potential caretakers.

Since the November 21, 2019, hearing, Knott and a caseworker had reached out to Joshua's attorney via email several times, requesting that they have discussions to work out a placement plan or visitation. Neither Joshua nor his attorney had responded to such requests. Knott expressed having certain concerns until DHHS could work with Joshua in developing a plan regarding the logistics of placement, mainly about how Joshua would handle hypothetical emergent situations that could arise in the middle of the night. Knott testified that he believed that because B.C. was a state ward, DHHS had certain obligations to ensure the safety of any placement—apparently including with a noncustodial parent against whom no allegations had been made. According to Knott, "the biggest barrier" to placement with Joshua was "not being able to have an open and honest conversation" with him.

Part of Knott's testimony was adduced upon questioning by the juvenile court judge. The judge asked if, since the prior hearing, Knott had been given any more specifics about assistance with meal preparation or general preparedness to care for B.C. over the upcoming holiday break, which Knott testified he had not. Further, Knott agreed, upon the judge's questioning, that it was possible "that had [Joshua] cooperated with [DHHS] and [its] efforts from the last hearing to come up with a plan, [Knott] could've been in a position today to recommend [B.C.] be placed with [Joshua] in his home today." Knott also agreed with the judge that it was "fair to say" that Joshua's "unwillingness to do that has delayed in progress in

that regard." Finally, the court asked several questions of Knott regarding DHHS' requirements, responsibilities, and expectations once a child becomes a state ward. Knott affirmed that DHHS felt a responsibility to be able to follow up on placements, going to the home at least once a month for private conversations with the child and caregivers to see how things were going. Knott testified he was concerned that Joshua would not allow that.

#### (ii) B.C.'s Mother's Testimony

B.C.'s mother testified at the hearing that during the course of her relationship with Joshua, which she said ended in May 2019, they had arguments that sometimes became "physical." She described one incident over winter break in 2015 when Joshua was intoxicated and threatened to shoot himself, shoot her, and then shoot the children. It was unclear if Joshua was brandishing a weapon at that time. The police intervened, arrested Joshua, and confiscated his weapons. She testified that Joshua was initially charged with terroristic threats but that the charges might have been dropped.

B.C.'s mother testified that her "only concern" with B.C.'s being placed in Joshua's care was "if he's mentally capable of handling certain situations." When asked, she also affirmed she was concerned with excessive drinking. She testified that when she moved out, Joshua had approximately 13 guns locked in a gun safe he had acquired after the terroristic threats incident.

#### (c) December 23, 2019, Order Granting
#### Intervention and Denying Placement

At the close of the evidence, Joshua's counsel argued that a parent who is not the subject of a petition to adjudicate the child retains constitutional parental preference such that a child removed from the home under a petition alleging fault or habits of the other parent must automatically be placed with the parent who is not the subject of the petition.

Joshua's counsel referred to the motion for placement as being "actually a little bit awkward because the Court has

not acquired jurisdiction over this child"—an allegation that was apparently elaborated upon in the trial brief that is not in the record. Also, Joshua's counsel referred to the court's "argumentative suggestions — suggestive and leading questions" of Knott. But Joshua's counsel did not move to disqualify the juvenile court judge.

The court disagreed with Joshua's arguments, including that it had to place B.C. with him because of the parental preference doctrine. The court stated that based on the evidence presented, Joshua was "currently a parent who's unfit to have his child placed in his care." It also found that it was not in B.C.'s best interests for the placement to occur.

In support of these conclusions, the court cited "[t]he lack of any ability to try to overcome the concerns." The court explained that it had "made it very clear" a month before what its concerns were and that DHHS had "made a number of efforts to try to overcome those issues and concerns and unfitness." The court stated, "[T]here hasn't been any cooperation whatsoever."

In an order filed on December 23, 2019, the court found that Joshua was B.C.'s father and allowed Joshua to intervene. The same order memorialized the court's denial of Joshua's motion for placement. The court found that Joshua was not "currently a fit and proper parent to have custody," noting that Joshua "has not been willing to work with DHHS to develop a plan to overcome the barriers to approving that placement." Due in part to such lack of cooperation, the court found that "it would not be safe" for B.C. "to be placed in the home of his father at this time." Such placement would be "contrary to the health, safety, and welfare" of B.C. and would not be in B.C.'s best interests.

The court ordered DHHS to continue to make efforts to work with Joshua to overcome the barriers to placement, noting that once a plan is in place that ensures the safety and well-being of B.C., Joshua could petition the court for placement and a further hearing would be timely scheduled. Joshua appealed the December 23, 2019, order.

### 5. February 27, 2020, Order
#### of Adjudication

Subsequently, the juvenile court held a hearing on adjudication. Joshua objected to the hearing on the ground that his pending appeal of the denial of his motion for placement divested the court of jurisdiction to adjudicate B.C. The court found the case law relied upon by Joshua inapposite and found that the mother had an interest in case progression so that a rehabilitative plan could be developed to place B.C. back in her care as soon as possible. The juvenile court accepted the mother's plea of no contest to the petition for adjudication.

In an order dated February 27, 2020, the court overruled Joshua's objection. The court articulated as part of its findings that "[t]he current goal in this case is to return the juveniles to the custody of [their mother]."

That same date, the court issued an order adjudicating B.C. and his half siblings as lacking proper parental care by reason of the fault or habits of their mother and determining that they were in a situation dangerous to their life or limb or injurious to their health or morals. At some point, the court had placed B.C. and his half siblings in a different foster care home from where they were first placed. The court ordered all prior temporary orders to remain in effect.

### III. ASSIGNMENTS OF ERROR

In his appeal in case No. S-20-009 from the denial of his motion for placement, Joshua assigns, restated, that the juvenile court (1) erred by denying his motion for temporary placement; (2) was biased when considering his motion for placement; (3) erred by imposing, contrary to his superior parental right to custody and due process, the burden of proof on Joshua in relation to the placement decision; (4) treated him differently from the father of D.W., in violation of equal protection principles; and (5) issued void orders in the ex parte order of emergency temporary custody and the October 16, 2019, continuation of such temporary custody.

In his appeal from the adjudication order in case No. S-20-244, Joshua assigns that (1) the juvenile court erred in overruling his objection to proceeding with the hearing on the petition as to B.C. on the ground that the juvenile court had no jurisdiction to adjudicate B.C. due to the pending appeal in case No. S-20-009; (2) the juvenile court's order on February 27, 2020, adjudicating B.C. is void for lack of jurisdiction; and (3) the juvenile court judge's remark that "[t]he current goal in this case is to return the juveniles to the custody of [their mother]" was prejudicial and required disqualification.

## IV. STANDARD OF REVIEW

[1] A jurisdictional question that does not involve a factual dispute is a question of law that an appellate court resolves independently of the conclusions reached by the trial court.[1]

[2] The determination of whether the procedures afforded to an individual comport with constitutional requirements for due process presents a question of law.[2]

[3] Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.[3]

## V. ANALYSIS

### 1. Jurisdiction Over Appeal

[4] We first address whether we have jurisdiction over the order denying Joshua's motion for placement that is being appealed in case No. S-20-009. Under Neb. Rev. Stat. § 25-1911 (Reissue 2016), for an appellate court to acquire jurisdiction

---

[1] See *In re Interest of Enyce J. & Eternity M.*, 291 Neb. 965, 870 N.W.2d 413 (2015).

[2] *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018).

[3] *In re Interest of Karlie D.*, 283 Neb. 581, 811 N.W.2d 214 (2012).

of an appeal, there must be a final judgment or final order entered by the tribunal from which the appeal is taken.[4] Also, Neb. Rev. Stat. § 43-2,106.01(1) (Reissue 2016) provides that "[a]ny final order or judgment entered by a juvenile court may be appealed to the Court of Appeals in the same manner as an appeal from district court to the Court of Appeals," and § 43-2,106.01(2)(c) specifies that such appeal may be taken by "[t]he juvenile's parent."

Because the juvenile proceedings are still ongoing, there has yet to be a judgment.[5] The State asserts that the December 23, 2019, order denying Joshua's motion for placement is not a final, appealable order as defined by Neb. Rev. Stat. § 25-1902 (Supp. 2019). The State acknowledges that orders governing temporary placement away from a parent ordinarily constitute final orders pursuant to § 25-1902(1)(b), as orders affecting a substantial right made during a special proceeding.[6] It argues, however, that the denial of Joshua's motion for placement was a mere continuation of the court's prior order on October 17 of temporary physical custody remaining with DHHS, outside of the mother's home, and that the December 23 order therefore did not have a substantial effect on Joshua's substantial rights.

We have said that when an "'order from a juvenile court is already in place and a subsequent order merely extends the time for which the previous order is applicable, the subsequent order by itself does not affect a substantial right and does not extend the time in which the original order may be appealed.'"[7] But when we have thus found a subsequent

---

[4] *State v. Lotter*, 301 Neb. 125, 917 N.W.2d 850 (2018).

[5] See Neb. Rev. Stat. § 25-1301(1) (Reissue 2016).

[6] See, *In re Interest of R.R.*, 239 Neb. 250, 475 N.W.2d 518 (1991); *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *disapproved on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998).

[7] See, e.g., *In re Guardianship of Rebecca B. et al.*, 260 Neb. 922, 931, 621 N.W.2d 289, 295 (2000).

order to "'merely extend[] the time'" of the prior order, the interests of the person who wished to appeal the subsequent order had been specifically adjudicated by the prior order and that person had notice of the prior proceedings and accordingly had the opportunity to appeal it.[8]

Here, the October 17, 2019, order was issued before Joshua intervened. He was given no notice of the proceedings leading up to the October 17 order, did not participate in that placement hearing, and was not given notice of the order itself. Furthermore, in making its placement decision in the October 17 order, the court had not been presented with Joshua as a possible placement. The juvenile court had not been asked, pursuant to a motion for placement, to adjudicate B.C.'s temporary custody in light of the parental preference doctrine as applies to Joshua. Rather, the court considered only whether the mother was at that time unfit for physical custody such that B.C. should remain outside of her home. Different rights were affected by the October 17 order maintaining B.C.'s temporary custody outside of the mother's home and the December 23 order denying Joshua's motion for temporary custody.

The court's December 23, 2019, order denying Joshua's motion for custody did not merely extend the time of the applicability of the October 17 order of temporary custody outside of the mother's home and in foster care. Instead, it was the juvenile court's first adjudication of Joshua's parental right to temporary physical custody of B.C. over the State's interest in custody. The December 23 order presented Joshua's first opportunity to appeal its determination of that issue. The December 23 order was final under § 25-1902(1)(b), and we have jurisdiction over the appeal in case No. S-20-009.

## 2. SUBJECT MATTER JURISDICTION

Joshua makes several arguments that seek to vacate the underlying order granting the State temporary legal custody over B.C., which necessitated Joshua's motion for placement

---

[8] See *id.*

so that B.C. would not be in foster care. He believes that the October 17, 2019, order is "void"[9] for lack of subject matter jurisdiction. We disagree.

Joshua's reasoning is complicated. He argues that the October 14, 2019, ex parte order of emergency temporary custody was void for four reasons. First, he argues there was no order of temporary custody filed within 48 hours as required by Neb. Rev. Stat. § 43-250(2) (Cum. Supp. 2018), which, he notes, does not expressly exclude nonjudicial days. Second, Joshua asserts that the ex parte order was void because there was no petition filed in accordance with § 43-247 and Neb. Rev. Stat. § 43-261(1)(a) (Reissue 2016) at the time of the ex parte order and because there is no statute authorizing a juvenile court to issue such an order in the absence of a petition. Third, Joshua takes issue with the fact that the motion for the ex parte order was file stamped at the exact same time as the order granting the same, this allegedly being "problematic"[10] and implicating procedural due process because the order was not in response to a motion. Fourth, he alleges that because the ex parte order did not attach the affidavit, it is "impossible to know for certain"[11] whether the affidavits relied on by the court were made part of the record of the proceedings as required in *In re Interest of R.G.*[12]

The alleged voidness of the ex parte order in turn allegedly rendered the October 16, 2019, hearing void, which, in turn, allegedly rendered the October 17 order continuing temporary custody void, "because it was premised on a hearing that, legally, was never ordered to occur."[13] Joshua asserts that it does not matter that a petition for adjudication under § 43-247(3)(a) was filed between the filing of the ex parte

---

[9] Brief for appellant in case No. S-20-009 at 19.

[10] *Id.* at 48.

[11] *Id.*

[12] *In re Interest of R.G., supra* note 6.

[13] Brief for appellant in case No. S-20-009 at 20.

order and the hearing, because the untimely petition could not "resuscitate a void order" and "there is no statutory or judicial authority in Nebraska for a juvenile court ordering or holding a hearing on the issue of a juvenile's pre-adjudication detention or placement in the absence of a prior, valid pre-adjudication detention or placement order or a properly filed motion by the State."[14]

[5,6] Subject matter jurisdiction deals with the court's ability to hear a case.[15] Subject matter jurisdiction is the power of a tribunal to hear and determine a case of the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.[16]

[7] We have held that to obtain jurisdiction over a juvenile and the juvenile's parents, the court's only concern is whether the condition in which the juvenile presently finds himself or herself fits within the asserted subsection of § 43-247.[17] The juvenile court's subject matter jurisdiction in this case was conferred by § 43-247, which provides that "[t]he juvenile court . . . shall have . . . jurisdiction of" any juvenile defined in § 43-247(3) and of the "parent, guardian, or custodian." Section 43-247(3) describes the circumstances of the juvenile, including one who is in a situation dangerous to life or limb or injurious to the health or morals of such juvenile. Section 43-247(5) describes "[t]he parent, guardian, or custodian of any juvenile described in this section."

While procedural due process requires that a petition for adjudication allege specific factual allegations as to why the juvenile falls under § 43-247(3)(a),[18] it has been held that

---

[14] *Id.* at 42 (emphasis omitted).

[15] *In re Interest of Devin W. et al.*, 270 Neb. 640, 707 N.W.2d 758 (2005).

[16] *Id.*

[17] See, *In re Interest of Sloane O.*, 291 Neb. 892, 870 N.W.2d 110 (2015); *In re Interest of Devin W. et al., supra* note 15.

[18] See, e.g., *In re Interest of Trenton W. et al.*, 22 Neb. App. 976, 865 N.W.2d 804 (2015).

even inadequacies in the petition pertaining to parental notice do not divest the juvenile court of its subject matter jurisdiction.[19] Not all juveniles over which the juvenile court exercises subject matter jurisdiction pursuant to § 43-247 have been temporarily removed from the home pursuant to an ex parte order. There is nothing in the juvenile code indicating that the procedures governing ex parte orders are integral to the juvenile court's subject matter jurisdiction to subsequently issue a temporary custody order following a petition for adjudication under § 43-247 and an evidentiary hearing.

Irregularities pertaining to the ex parte custody order could not render the October 17, 2019, order void. We need not address the merits of these alleged irregularities leading to the October 14 temporary ex parte order that is no longer in effect and is moot.[20] The ex parte order has no bearing on the December 23 order on Joshua's motion for placement. The juvenile court has jurisdiction to determine the proper placement of B.C. while the juvenile case brought under the petition for adjudication under § 43-247(3)(a) remains open. We proceed to the merits of its December 23 order.

## 3. Placement

Joshua argues that when a petition under § 43-247(3)(a) is based on the conduct of one parent, unless the State affirmatively pleads and proves the unfitness of the other parent who does not reside in the home the child was removed from, the parental preference doctrine requires that the child be placed with the other parent instead of in foster care. Joshua elaborates that procedural due process requires that the noncustodial parent be given notice of specific allegations of unfitness before the State can deprive such parent of temporary custody pursuant to that parent's constitutionally protected parental

---

[19] See *In re Interest of Taeven Z.*, 19 Neb. App. 831, 812 N.W.2d 313 (2012).

[20] See *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004).

preference. And a parent who is not described in a petition for adjudication is not given the necessary notice unless other filings are made.

Joshua points out that the State never alleged in any filings in juvenile court that he was unfit or had forfeited his superior right to custody, and he asserts that the court violated his due process rights both by litigating unfitness and by placing upon him at the hearings on his motion for placement the burden of demonstrating that he was fit to parent B.C. He argues that once he established his constitutionally protected status as a parent, the motion for placement should have been granted without further inquiry. He was not required to cooperate with DHHS in forming a plan that would provide assurances of B.C.'s safety, because the parental preference doctrine dictates that absent a showing of unfitness, he has a superior right to custody without undue State interference. Alternatively, Joshua argues that the evidence did not establish by a preponderance of the evidence that he was unfit.

The State, for its part, points out that it has been granted temporary legal custody over B.C. and is attempting to dutifully exercise its parens patriae responsibility to ensure B.C.'s welfare wherever he is placed. And the juvenile code contemplates jurisdiction over not only the child described therein, but also over such child's parents.[21] The State notes that the juvenile court concluded that B.C.'s welfare could not be ensured without more cooperation from Joshua in creating a safety plan. Thus, the juvenile court determined that the State had proved that at least at the moment, Joshua was "unfit." It denies that it placed the burden on Joshua to prove himself fit.

The question presented in this appeal is where the net weight lies in the balance between the State's parens patriae interest in protecting B.C.'s welfare and Joshua's liberty and privacy interests in the care, custody, and management of his

---

[21] See, § 43-247(5); *In re Interest of Devin W. et al., supra* note 15; *In re Interest of Sabrina K.*, 262 Neb. 871, 635 N.W.2d 727 (2001).

child.[22] This case specifically raises questions concerning what level of State intrusion into the rights of a noncustodial parent, against whom no allegations have been made, is justified by a pending adjudication of the child under § 43-247(3)(a) due to allegations against the custodial parent and after a determination that the child would be at significant risk of harm if maintained in the custodial parent's home. It also raises issues of how the noncustodial parent's disability is treated in relation to determining temporary custodial rights.

[8-10] The relationship between parent and child is constitutionally protected and cannot be affected without procedural due process.[23] Due process of law is the "basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise."[24] But due process, "'unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'"[25] The concept of due process embodies the notion of fundamental fairness and defies precise definition.[26] Due process is flexible and calls for such procedural protections as the particular situation demands.[27]

The constitutional protections in the realm of parental rights and parens patriae responsibilities must be "elaborated with care."[28] In determining where the net weight lies, we must evaluate Joshua's interests that were at stake in the temporary placement of B.C. in foster care rather than in Joshua's

---

[22] See *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981).

[23] *State ex rel. Grape v. Zach*, 247 Neb. 29, 524 N.W.2d 788 (1994).

[24] *In re Gault*, 387 U.S. 1, 20, 87 S. Ct. 1428, 18 L. Ed. 527 (1967).

[25] *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

[26] *In re Interest of Sloane O., supra* note 17.

[27] *Id.*

[28] See, e.g., *Troxel v. Granville*, 530 U.S. 57, 101, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (Kennedy, J., dissenting).

home. We must determine the risk of erroneous deprivation of such interests through the procedures used and the probable value, if any, of additional or substitute procedural safeguards. And we must evaluate the State's interest in the placement decision, including the function involved and the fiscal and administrative burdens that additional procedural requirements would entail.[29]

[11] "[P]arents have a fundamental liberty interest in caring for and guiding their children, and a corresponding privacy interest—absent exceptional circumstances—in doing so without the undue interference of strangers to them and to their child"; these interests, however, "'"do not spring full-blown from the biological connection between parent and child."'"[30] The "mere existence of a biological link does not merit [substantial] constitutional protection."[31] Rather, such liberty interest stems from the more enduring relationship developed upon a biological parent's "commitment to the responsibilities of parenthood."[32] If the parent fails to grasp the opportunity to develop a relationship with the parent's offspring and does not accept "some measure of responsibility for the child's future," "the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie."[33]

[12] The U.S. Supreme Court has held that an unwed biological father who has grasped the opportunity to establish

---

[29] See, *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Lassiter v. Department of Social Services, supra* note 22; *Mathews v. Eldridge, supra* note 25.

[30] *Troxel v. Granville, supra* note 28, 530 U.S. at 87 (Stevens, J., dissenting). See, also, e.g., *Prince v. Massachusetts*, 321 U.S. 158, 64 S. Ct. 438, 88 L. Ed. 645 (1944); *In re Interest of Enyce J. & Eternity M., supra* note 1. See, also, *State on behalf of Tina K. v. Adam B., ante* p. 1, 948 N.W.2d 182 (2020).

[31] *Lehr v. Robertson*, 463 U.S. 248, 261, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983).

[32] *Id.*

[33] *Id.*, 463 U.S. at 262.

a familial relationship with his biological child has an interest in personal contact with his child, which interest is given substantial protection under the Due Process Clause of the 14th Amendment.[34] "The private interest . . . of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection."[35] It has been established both that Joshua is B.C.'s biological father and that he has cared for and supported B.C. throughout most of B.C.'s life. Joshua is also B.C.'s legal father by virtue of the acknowledgment of paternity. Under these facts, Joshua has a fundamental liberty interest in the care, custody, and management of B.C. that is entitled to substantial protection under the Due Process Clause of the 14th Amendment.

[13] The State has an interest in the placement of B.C. that is derived from its role as parens patriae.[36] That interest is also important.[37] Parens patriae means, in essence, that the State has a right to protect the welfare of its resident children.[38] When parental control fails, the State must play its part as parens patriae.[39] The State has an interest in determining the status and custody that will best meet the child's needs and wants, which is invoked both in proceedings under the juvenile code and when the State must adjudicate custody rights as between two parents.[40]

---

[34] See, e.g., *Lehr v. Robertson, supra* note 31; *In re Adoption of Corbin J.*, 278 Neb. 1057, 775 N.W.2d 404 (2009).

[35] *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972).

[36] *In re Interest of Enyce J. & Eternity M., supra* note 1.

[37] See *In re Interest of Anthony G.*, 255 Neb. 442, 586 N.W.2d 427 (1998).

[38] *In re Interest of Karlie D., supra* note 3.

[39] See *In re Interest of S.R., D.R., and B.R.*, 239 Neb. 871, 479 N.W.2d 126 (1992).

[40] See, e.g., *Copple v. Copple*, 186 Neb. 696, 185 N.W.2d 846 (1971); *State ex rel. Cochrane v. Blanco*, 177 Neb. 149, 128 N.W.2d 615 (1964); *Meyerkorth v. State*, 173 Neb. 889, 115 N.W.2d 585 (1962); *In re Application of Reed*, 152 Neb. 819, 43 N.W.2d 161 (1950); *In re Interest of Stephanie H. et al.*, 10 Neb. App. 908, 639 N.W.2d 668 (2002).

When called upon, the State, through the juvenile court, merely performs its duty of seeing that the child was properly cared for.[41] The juvenile court is a product of the solicitude of the law for the welfare of infants.[42] Its powers and duties are described in detail in our statutes, and because of their humanitarian and beneficent purpose, these statutes should be liberally construed to the end that their manifest purpose may be effectuated to the fullest extent compatible with their terms.[43] Neb. Rev. Stat. § 43-246 (Supp. 2019) provides in relevant part that the juvenile code shall be construed to ensure the rights of all children to care and protection and a safe and stable living environment, "with due regard to parental rights."

[14-16] The "'rights of parenthood,'" even of a fit parent, are not "'beyond limitation'"[44] by the State's powers and duties as parens patriae. Thus, for example, the State may impose through laws of neutral and general applicability certain educational requirements, restrictions on child labor, and compulsory vaccination, even when against the parents' wishes.[45] But, as the U.S. Supreme Court has explained, the "State registers no gain towards its declared goals when it separates children from the custody of fit parents."[46] Where a child is cared for by a fit parent, the State's interest in caring for the child is "de minimis."[47] "[T]he State cannot presume that a child and his parents are adversaries."[48] Only the paramount interest

---

[41] See *DeBacker v. Brainard*, 183 Neb. 461, 161 N.W.2d 508 (1968).

[42] *Stewart v. McCauley*, 178 Neb. 412, 133 N.W.2d 921 (1965).

[43] See *id.*

[44] *Douglas Cty. v. Anaya*, 269 Neb. 552, 560, 694 N.W.2d 601, 607 (2005), quoting *Prince v. Massachusetts, supra* note 30. See, also, *Copple v. Copple, supra* note 40; *State ex rel. Cochrane v. Blanco, supra* note 40; *Meyerkorth v. State, supra* note 40.

[45] See, e.g., *Prince v. Massachusetts, supra* note 30; *Douglas Cty. v. Anaya, supra* note 44.

[46] *Stanley v. Illinois, supra* note 35, 405 U.S. at 652.

[47] *Id.*, 405 U.S. at 657 (emphasis omitted).

[48] *Santosky v. Kramer, supra* note 29, 455 U.S. at 760.

which the public has in the protection of the rights of the child can subjugate the rights of parents to maintain custody of their children.[49]

Due to the allegations against the mother, the State has been called upon to play its role as parens patriae for B.C. And during proceedings under § 43-247(3)(a), the juvenile court has broad jurisdiction regarding placement.[50] B.C. was removed from his mother's home upon probable cause that he was seriously endangered in his surroundings and that immediate removal was necessary for his protection.[51] B.C. remained in DHHS' continuing temporary physical custody pending adjudication in accordance with the juvenile code's requirement that the court find that being placed back in the mother's home would be contrary to B.C.'s health, safety, or welfare.[52] But aside from its general mandate that due regard be given to parental rights,[53] the juvenile code's provisions governing physical custody pending disposition do not specifically contemplate situations where only one parent resides in the home from which the child was removed.

[17-19] We have held in situations where a child is removed from one parent's home pursuant to the juvenile code that the juvenile court's discretion regarding placement pending disposition is limited by Nebraska's "parental preference doctrine," which governs the rights of the other parent against whom no allegations have been made.[54] The parental preference doctrine holds that in a child custody controversy between a biological parent and one who is neither a biological nor an adoptive parent, the biological parent has a superior right to the custody

---

[49] See *In re Interest of Sloane O., supra* note 17.

[50] See, e.g., *In re Interest of Karlie D., supra* note 3.

[51] See § 43-248.

[52] See Neb. Rev. Stat. § 43-254 (Cum. Supp. 2018).

[53] § 43-246(2).

[54] See *In re Interest of Kamille C. & Kamiya C.*, 302 Neb. 226, 233, 922 N.W.2d 739, 746 (2019).

of the child.[55] Under the parental preference doctrine, unless the State affirmatively shows a parent is unfit or has forfeited the right to custody, due regard for the parent's natural right to the custody of a child requires that a parent be presumptively regarded as the proper guardian.[56] Only exceptional circumstances involving proof of serious physical or psychological harm to the child or a substantial likelihood of such harm will negate the superior right of a fit parent who has not forfeited parental rights to custody under the parental preference doctrine.[57]

Thus, in *In re Interest of Sloane O.*,[58] we held that due process protected the custody rights of a mother whose child had been adjudicated due to the faults or habits of the father, which rights were "subject only to the State's interest in protecting [the child] from harm."[59] In considering the mother's motion for temporary custody, we held that the juvenile court should have presumed under the parental preference doctrine that the mother was the best person to parent the child unless and until the State affirmatively demonstrated otherwise.[60]

The mother in *In re Interest of Sloane O.* had been physically separated from the father, and a divorce action was pending. We held that evidence that the mother had previously witnessed incidents of the father's chaining the child to a couch was insufficient to meet the State's burden to prove the mother unfit and overcome parental preference.[61] We reversed

---

[55] *Id.*

[56] See, e.g., *In re Interest of Sloane O., supra* note 17; *In re Interest of Jaydon W. & Ethan W.*, 25 Neb. App. 562, 909 N.W.2d 385 (2018); *In re Interest of Miah T. & DeKandyce H.*, 23 Neb. App. 592, 875 N.W.2d 1 (2016); *In re Interest of Stephanie H. et al., supra* note 40.

[57] See *State on behalf of Tina K. v. Adam B., supra* note 30.

[58] *In re Interest of Sloane O., supra* note 17.

[59] *Id.* at 903, 870 N.W.2d at 118.

[60] See *id.*

[61] See *In re Interest of Sloane O., supra* note 17.

the juvenile court's denial of the mother's motion for custody and remanded the cause for further proceedings to consider the most up-to-date information regarding the child.[62]

The Court of Appeals, in *In re Interest of Stephanie H. et al.*,[63] held similarly when it reversed the juvenile court's order denying the noncustodial mother's motion for placement after her children had been removed from the custodial father's home under allegations of sexual abuse. The Court of Appeals held that fundamental fairness demanded that the mother "be given prompt notice of any allegations against her which the State or [DHHS] contends make placement of her children with her contrary to the children's best interests."[64] The burden of proof was thereafter upon the State to overcome the parental preference doctrine.

Evidence in *In re Interest of Stephanie H. et al.* that the mother was living with a man for the preceding 6 months, knowing he was on "'work release'"[65] but not knowing whether he had a criminal record, did not "remotely resembl[e] an affirmative showing"[66] that the mother was unfit or that she had forfeited her parental rights. The State had neither alleged nor proved that the mother should not have custody of her children.[67] The Court of Appeals reversed the order of the juvenile court and remanded the cause with directions to place the children with the mother pending adjudication. The court noted, however, that its mandate did not preclude the State from coming forward in the future "with allegations and proof that [the mother was] not a fit custodial parent of her children."[68]

---

[62] See *id.*

[63] *In re Interest of Stephanie H. et al., supra* note 40.

[64] *Id.* at 921-22, 639 N.W.2d at 680.

[65] *Id.* at 913, 639 N.W.2d at 674.

[66] *Id.* at 924, 639 N.W.2d at 682.

[67] *In re Interest of Stephanie H. et al., supra* note 40.

[68] *Id.* at 926, 639 N.W.2d at 683.

Likewise, in *In re Interest of Jaydon W. & Ethan W.*,[69] the Court of Appeals reversed the juvenile court's denial of the noncustodial father's motion for custody in ongoing proceedings for a child adjudicated due to the fault or habits of the custodial mother. DHHS had objected to the father's custody based on regression in the children's behavior after visitation and a protection order that had expired approximately 1½ years earlier. The juvenile court indicated custody would be revisited after DHHS completed further assessments ordered by the court. But, relying on the parental preference doctrine, the Court of Appeals described that the initial question must be whether the presumption that the children's best interests are served by reuniting them with their father has been rebutted by clear and convincing evidence that the father is unfit or has forfeited his right to custody. The Court of Appeals found that it had not.

While the Court of Appeals expressed in *In re Interest of Jaydon W. & Ethan W.* that it understood the juvenile court's "reluctance to uproot the children from their long-term foster home, especially given their recent behavioral concerns,"[70] it held that the father's right to custody could be "disrupted only upon a finding that he is unfit or has forfeited his right to custody."[71] Still, the Court of Appeals explained that the juvenile court was not required to "order the children be turned over to [the father] immediately."[72] It was constitutionally permissible and in the children's best interests to implement a transition plan. The Court of Appeals remanded the cause with directions for the court to do so.

[20] Our case law is clear that when the allegations of a petition for adjudication invoking the jurisdiction of the juvenile court are against one parent only, the State cannot deny

---

[69] *In re Interest of Jaydon W. & Ethan W., supra* note 56.

[70] *Id.* at 576, 909 N.W.2d at 396.

[71] *Id.*

[72] *Id.* at 576-77, 909 N.W.2d at 397.

the other parent's request for temporary physical custody in lieu of a foster care placement unless it pleads and proves by a preponderance of the evidence that the other parent is unfit or has forfeited custody or that there are exceptional circumstances involving serious physical or psychological harm to the child or a substantial likelihood of such harm.

[21] We note, however, that the State is not required to grant a nonoffending biological parent's request for custody before confirming that the parent has actually acquired constitutionally protected parental status. We observe that in *In re Interest of Sloane O.* and *In re Interest of Stephanie H. et al.*, the custody and visitation rights of the nonoffending parent had been adjudicated by the district court.[73] Because parental preference derives not simply from biology but from the enduring relationship developed upon a biological parent's commitment to the responsibilities of parenthood, children removed from their homes due to the fault or habits of one parent need not immediately and without some minimal investigation be placed with the other biological parent whose status as having "an actual relationship of parental responsibility"[74] is unknown. Only once that relationship is established does such a parent who wishes for temporary physical custody during the pendency of juvenile proceedings have a parental preference that cannot be denied without notice and an affirmative showing by a preponderance of the evidence[75] that the parent is unfit or has forfeited the parental relationship or that an exceptional circumstance of serious physical or psychological harm to the child or a substantial likelihood of such harm exists.

[22-24] Furthermore, as the Court of Appeals recognized in *In re Interest of Jaydon W. & Ethan W.*, due process is

---

[73] *In re Interest of Sloane O., supra* note 17; *In re Interest of Stephanie H. et al., supra* note 40.

[74] *Lehr v. Robertson, supra* note 31, 463 U.S. at 260.

[75] *In re Interest of R.G., supra* note 6.

"flexible,"[76] not "'a fixed content unrelated to time, place and circumstances.'"[77] Accordingly, the nonoffending parent's exercise of the parental preference of custody is not entirely unfettered during the juvenile court's continuing jurisdiction under the juvenile code. The juvenile court, in the exercise of its parens patriae responsibilities, may develop a transition plan constituting a reasonable intrusion of limited duration into the nonoffending parent's rights to autonomy in the care and custody of the child. Likewise, it does not violate due process for the juvenile court in its determination of the child's best interests and in its role as adjudicator of the custody rights between two parents to require the nonoffending parent's cooperation with goals of reunification back into the home from where the child was taken.[78] After all, the parental preference doctrine serves no role in determining the custody rights between two biological or legal parents.

[25-27] It was established at the hearing on Joshua's motion for placement that he is a parent entitled to substantial protection under the Due Process Clause of the 14th Amendment. Yet, there was never a formal allegation placing Joshua on notice that he would have to defend against an attempt by the State to prove he had lost the presumption of parental preference. Procedural due process generally requires that notice be given of such a nature as to reasonably convey the required information.[79] In the context of denying parental preference in a placement decision during proceedings under § 43-247(3)(a), reasonable notice must include the factual bases for seeking to prove that the parent is unfit or has forfeited parental

---

[76] *In re Interest of Jaydon W. & Ethan W., supra* note 56, 25 Neb. App. at 572, 909 N.W.2d at 394.

[77] *Mathews v. Eldridge, supra* note 25, 424 U.S. at 334.

[78] See Vivek S. Sankaran, Parens Patriae *Run Amuck: The Child Welfare System's Disregard for the Constitutional Rights of Nonoffending Parents*, 82 Temple L. Rev. 55 (2009).

[79] See *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 865 (1950).

rights or that exceptional circumstances exist involving serious physical or psychological harm to the child or a substantial likelihood of such harm.[80] While as to the parent from whose home the child was removed, such notice is ordinarily contained in the petition for adjudication,[81] allegations as to the fault or habits of the custodial parent do not operate to give notice to the noncustodial parent that the State seeks to rebut that parent's right to parental preference in its placement decisions.

We agree with Joshua that because he was not given notice that his fitness, forfeiture, or exceptional circumstances were to be adjudicated at the hearing on his motion for placement, the juvenile court could not properly deprive him of his right to custody under the parental preference doctrine. The court found Joshua unfit, but without specific allegations of unfitness. The court violated Joshua's rights to procedural due process. Without a proper adjudication that the State had rebutted Joshua's parental preference by a preponderance of the evidence, the parental preference doctrine required temporary placement of B.C. with Joshua, who has developed an enduring relationship with B.C. and has committed to the responsibilities of parenthood. We therefore reverse the district court's order denying Joshua's motion for placement on procedural due process grounds and remand the cause with directions to grant Joshua temporary physical placement after establishing, with the most up-to-date information, an appropriate plan for B.C.'s transition into Joshua's temporary physical custody.

Granting Joshua's motion for temporary physical placement does not mean that the juvenile court lacks any authority over B.C. and Joshua.[82] At the time of B.C.'s removal, the mother was the de facto custodial parent, and the State's current goal is reunification with her and placement back into the home B.C. was removed from. Joshua has not sought custody in

---

[80] See *id.*

[81] See *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007).

[82] See, § 43-247(3) and (5); *In re Interest of Devin W. et al., supra* note 15.

district court or through a bridge order[83] in juvenile court. The juvenile court has the power to require cooperation with orders of visitation with the mother and its reunification plan. Temporary physical custody with a noncustodial parent ought not create a "substantial and unnecessary hindrance to efforts of reunification" with the custodial parent.[84] Furthermore, a plan for B.C.'s welfare during the transition from his foster placement to Joshua's care is an appropriate exercise of the State's parens patriae jurisdiction so long as the plan is a temporary and minor intrusion into Joshua's parental rights.

We note that on remand, the State is free to attempt to properly plead factual bases for an allegation that Joshua is unfit and again try to prove that placement with Joshua is not required under the parental preference doctrine. Parents have no double jeopardy defense against repeated efforts by the State to modify temporary placement during a juvenile proceeding.[85] Therefore, in order to provide guidance for an issue that is likely to resurface on remand, we discuss the lower court's approach to its fitness determination for Joshua, who is currently experiencing a physical disability. It appears that the State and the juvenile court were operating under the wrong standards.

Instead of evaluating whether the State had affirmatively proved Joshua unfit, the juvenile court seemed to shift the burden onto Joshua to prove himself fit. The court concluded that Joshua's lack of "cooperation" in allaying "concerns" rendered him unfit. But the "concerns" described did not themselves establish unfitness. Rather, they were questions about how Joshua, wheelchair bound, would be able to address hypothetical scenarios that may or may not arise. The court and DHHS were worried about Joshua's testimony that he required assistance from home health care aides in

---

[83] See Neb. Rev. Stat. § 43-246.01 (Reissue 2016).

[84] *In re Interest of Ethan M.*, 15 Neb. App. 148, 158, 723 N.W.2d 363, 371 (2006).

[85] See *Santosky v. Kramer, supra* note 29.

the morning getting into his wheelchair, that he could not sit up on his own yet, and that he did not have overnight care. They had concerns about the fact that Joshua did not prepare his own meals.

Joshua testified that he did not believe the lack of an overnight caretaker would endanger B.C., and he listed ways in which he could provide adequate food for B.C. When specific overnight scenarios were presented to Joshua during his testimony, he had adequate answers as to how he would handle them. For example, when asked about what he would do if there were a fire, Joshua responded that he would call the fire department. Joshua owns a four-bedroom home in the center of town which DHHS evaluated as being in appropriate condition. Joshua is able to support himself and B.C. on his disability income. Joshua has made arrangements for B.C.'s transportation to and from school, as well as to and from any appointments B.C. might have. While Joshua is not able to prepare meals himself, he testified as to several different options that would provide B.C. with sufficient food. B.C. lived with Joshua up until Joshua developed Guillain-Barre syndrome, the mother having described Joshua and B.C. as well bonded, and Joshua described a daily routine for B.C.'s care. Joshua described disability services, family, and members of the community he could reach out to as needed when difficult situations arise.

Still, the juvenile court, in its determination of unfitness, relied on the lack of a written safety plan developed in cooperation with DHHS that would address in more detail how B.C. would be cared for when Joshua lacked home health care or when B.C. would be in the home for longer periods of time. The court had concerns about the details of how Joshua would care for B.C. on weekends, snow days, and holidays, and how he might address nosebleeds and fevers developed in the middle of the night. The court appeared to presume that because of Joshua's disability, Joshua was unfit unless he could provide a detailed response to all of the posed hypothetical scenarios,

to be memorialized in a safety plan. Such a presumption is unlawful.

[28] While not directly controlling, we note that the Legislature has declared in Neb. Rev. Stat. § 42-364.18 (Cum. Supp. 2018) that individuals with disabilities "continue to face unfair, preconceived, and unnecessary societal biases as well as antiquated attitudes regarding their ability to successfully parent their children." And in Neb. Rev. Stat. § 42-364(2) (Cum. Supp. 2018), the Legislature declared that "no presumption shall exist that either parent is more fit or suitable than the other" based on either "the sex or [the] disability of the parent." Likewise, we hold that there is no presumption that a disabled parent is unfit, that a disabled parent has forfeited parental rights, or that exceptional circumstances exist involving serious physical or psychological harm to the child or a substantial likelihood of such harm because a parent is disabled.

[29] It is conceivable that a lack of adequate accommodations could render a disabled parent unable to care for a child, thereby affecting the State's placement decision. However, the simple fact that a parent is disabled does not overcome the presumption that the parent is a better caretaker of the parent's own child than the State is. The lack of a detailed safety plan to account for possible hypothetical scenarios that Joshua may have to address differently from a parent who is not wheelchair bound did not affirmatively prove him unfit.

The only evidence of unfitness presented at the hearing that was not related to Joshua's disability was a couple of "hectic" visitations involving both B.C. and his half siblings, "unfounded" past intakes, the mother's description of the incident in 2015, and the mother's general concern over excessive drinking. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing.[86] The juvenile court did not appear to rely

---

[86] *Tilson v. Tilson, ante* p. 275, 948 N.W.2d 768 (2020).

on such evidence in finding Joshua unfit under that definition, and, having reversed on procedural due process grounds, we need not determine in this appeal whether it would have been sufficient to sustain the State's burden.

We appreciate the juvenile court's concern for the welfare of the child it has been called upon to protect due to the fault or habits of the mother. And the State is not bound to wait until a tragedy has befallen a child before intervention occurs upon proof that the fault or habits of a parent present a risk of harm to the child.[87] But no notice was provided to Joshua that his fitness was at issue; therefore, the court erred in finding him unfit and in denying his parental preference to physical custody, which he sought to enforce through his motion for temporary placement. In the event the State attempts again to prove Joshua unfit after proper notice has been given, we clarify that a physical disability does not shift the burden to the disabled parent to prove fitness despite such disability.

### 4. Equal Protection

Because we reverse the December 23, 2019, order on procedural due process grounds, we need not address Joshua's arguments that the denial of his motion for placement violated equal protection.

### 5. Jurisdiction Over Adjudication Pending Appeal

We next address Joshua's argument in case No. S-20-244 that his appeal from the December 23, 2019, order denying his motion for placement deprived the juvenile court of jurisdiction to accept B.C.'s mother's plea and adjudicate B.C. due to the fault or habits of his mother. Joshua points out that he is a party to the case in which the adjudication order was rendered and that his parental rights are affected by the adjudication order that establishes with more permanency the court's

---

[87] See *In re Interest of M.B. and A.B.*, 239 Neb. 1028, 480 N.W.2d 160 (1992).

jurisdiction and legal custody over B.C., as well as its jurisdiction over Joshua pursuant to § 43-247(5).

[30] Nebraska case law generally holds that once an appeal has been perfected, the lower court is divested of its subject matter jurisdiction over that case.[88] However, we have held that a juvenile court is not wholly divested of jurisdiction during the pendency of an appeal from a final order.[89]

Neb. Rev. Stat. § 43-295 (Reissue 2016), which is directly applicable to the separate juvenile courts, states:

> Except when the juvenile has been legally adopted, the jurisdiction of the court shall continue over any juvenile brought before the court or committed under the Nebraska Juvenile Code and the court shall have power to order a change in the custody or care of any such juvenile if at any time it is made to appear to the court that it would be for the best interests of the juvenile to make such change.

Additionally, state law clearly provides, through Neb. Rev. Stat. § 43-2,106 (Reissue 2016), that in counties where there is no separate juvenile court, the county court sitting as a juvenile court shall continue to exercise supervision of the juvenile until a hearing is had in the appellate court and the appellate court enters an order making other disposition. Section 43-2,106 states in full:

> When a juvenile court proceeding has been instituted before a county court sitting as a juvenile court, the original jurisdiction of the county court shall continue until the final disposition thereof and no appeal shall stay the enforcement of any order entered in the county court. After appeal has been filed, the appellate court, upon application and hearing, may stay any order, judgment,

---

[88] See, e.g., *State v. Abram*, 284 Neb. 55, 815 N.W.2d 897 (2012); *Billups v. Scott*, 253 Neb. 293, 571 N.W.2d 607 (1997); *Anderzhon/Architects Inc. v. 57 Oxbow II Partnership*, 250 Neb. 768, 553 N.W.2d 157 (1996); *Flora v. Escudero*, 247 Neb. 260, 526 N.W.2d 643 (1995).

[89] See *In re Interest of Jedidiah P.*, 267 Neb. 258, 673 N.W.2d 553 (2004).

or decree on appeal if suitable arrangement is made for the care and custody of the juvenile. The county court shall continue to exercise supervision over the juvenile until a hearing is had in the appellate court and the appellate court enters an order making other disposition. If the appellate court adjudges the juvenile to be a juvenile meeting the criteria established in subdivision (1), (2), (3), or (4) of section 43-247, the appellate court shall affirm the disposition made by the county court unless it is shown by clear and convincing evidence that the disposition of the county court is not in the best interest of such juvenile. Upon determination of the appeal, the appellate court shall remand the case to the county court for further proceedings consistent with the determination of the appellate court.

Somewhat similarly, in dissolution proceedings, Neb. Rev. Stat. § 42-351(2) (Reissue 2016) provides that when final orders are pending on appeal

the court that issued such orders shall retain jurisdiction to provide for such orders regarding support, custody, parenting time, visitation, or other access, orders shown to be necessary to allow the use of property or to prevent the irreparable harm to or loss of property during the pendency of such appeal, or other appropriate orders in aid of the appeal process. Such orders shall not be construed to prejudice any party on appeal.

In *In re Interest of Jedidiah P.*,[90] we noted that while there is no statute governing the separate juvenile courts which, similarly to § 43-2,106, clearly articulates such courts' continuing jurisdiction during the pendency of an appeal, we could "discern no reason for a juvenile court not to retain such authority, regardless of whether it is a county court sitting as a juvenile court or a separate juvenile court." Therefore, we

---

[90] *In re Interest of Jedidiah P., supra* note 89, 267 Neb. at 263, 673 N.W.2d at 557.

held that a separate juvenile court continues to exercise super-
vision of the juvenile during an appeal.[91]

[31] The extent of the continuing jurisdiction of the sepa-
rate juvenile courts and the county courts sitting as juvenile
courts during the pendency of an appeal is not without limits
and must be determined by the facts of each case.[92] The ques-
tion is the level of supervision the separate juvenile court may
properly exercise during the pendency of the appeal, which is
governed by §§ 43-295 and 43-2,106.[93]

[32] We have held that the juvenile courts' continuing juris-
diction does not include the power to terminate a juvenile's
relationship with the child's parents.[94] In contrast, our courts
have found juvenile courts to have continuing jurisdiction dur-
ing the pendency of an appeal to issue an order to show cause
seeking enforcement of prior orders requiring a speech and
language assessment[95] and to order the temporary suspension
of visitation.[96] In *In re Interest of Andrew H. et al.*,[97] the Court
of Appeals held that an order of permanent disposition during
the pendency of an appeal of an adjudication order went beyond
the court's continuing jurisdiction to exercise supervision over

---

[91] See *id.*

[92] See *In re Interest of Becka P. et al.*, 296 Neb. 365, 894 N.W.2d 247 (2017);
*In re Interest of Jedidiah P., supra* note 89. See, also, e.g., *In re Interest of
Phoenix L.*, 270 Neb. 870, 708 N.W.2d 786 (2006), *disapproved on other
grounds, In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758
(2007); *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684
N.W.2d 594 (2004).

[93] *In re Interest of Jedidiah P., supra* note 89.

[94] See *id.*

[95] *In re Interest of Becka P. et al., supra* note 92.

[96] *In re Interest of Angeleah M. & Ava M.*, 23 Neb. App. 324, 871 N.W.2d 49
(2015), *disapproved on other grounds, In re Estate of Abbott-Ochsner*, 299
Neb. 596, 910 N.W.2d 504 (2018).

[97] *In re Interest of Andrew H. et al.*, 5 Neb. App. 716, 564 N.W.2d 611
(1997).

the juvenile; but in *In re Interest of Jedidiah P.*,[98] we held that the juvenile court had continuing jurisdiction during the pendency of an appeal of the adjudication order to issue an order of disposition changing the juvenile's custody from the juvenile detention center to a residential treatment center and granting temporary legal custody of the juvenile to DHHS. The difference was that in *In re Interest of Jedidiah P.*, the order of disposition was a temporary placement order, while in *In re Interest of Andrew H. et al.*, the court had issued a permanent dispositional order adopting a case plan and ordering custody outside the home until completion.

Under the specific facts presented here, we find that the juvenile court had continuing jurisdiction to accept the mother's plea and adjudicate B.C. while Joshua's appeal from the order denying his motion for placement was pending. Joshua's reliance on *In re Interest of Joshua M. et al.*[99] to argue otherwise is misplaced. We held in *In re Interest of Joshua M. et al.* that the juvenile court lacked jurisdiction to terminate parental rights to three children during the pendency of appeals from a final order of placement outside the home preadjudication as to one child and from final orders modifying dispositional orders to place outside the home the two other children. The juvenile court did not proceed in this case to a termination of parental rights.

We note that successful appeals challenging orders of adjudication would eliminate a juvenile court's jurisdiction over the juvenile and its power to issue permanent dispositional orders, while successful appeals from temporary placement orders would not. Neb. Rev. Stat. § 43-278 (Reissue 2016) provides that absent a showing of good cause, an adjudication hearing shall be held no more than 90 days after a petition is filed. As the juvenile court noted, B.C.'s mother had an interest in promptly adjudicating her children so that she could

[98] *In re Interest of Jedidiah P., supra* note 89.

[99] *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997).

more quickly proceed to a rehabilitative plan and placement of the children back in her care. Joshua's appeal from the denial of his motion for temporary placement can have no effect on the juvenile court's underlying jurisdiction in this case to promptly proceed with its statutory duties. The court's order of adjudication was a proper exercise of the juvenile court's ongoing supervisory powers during the pendency of Joshua's appeal in case No. S-20-009. Accordingly, we hold that the order of adjudication is not void.

## 6. Disqualification

Lastly, because judicial disqualification is not subject to a harmless error analysis[100] and this is a continuing matter, we address Joshua's assignments of error challenging the juvenile court judge's impartiality. Joshua argues that the juvenile court judge demonstrated personal bias and prejudice against him through leading questions of Knott during the December 23, 2019, hearing and the statement in the order of adjudication that "[t]he current goal in this case is to return the juveniles to the custody of [their mother]."

[33] The Nebraska Revised Code of Judicial Conduct requires that "[a] judge shall hear and decide matters assigned to the judge, except when disqualification is required . . . ."[101] The code further states that "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned . . . ."[102] Under the code, such instances in which the judge's impartiality might reasonably be questioned specifically include where "[t]he judge has a personal bias or prejudice concerning a party or a party's lawyer . . . ."[103] The issue of judicial disqualification

---

[100] See *Tierney v. Four H Land Co.*, 281 Neb. 658, 798 N.W.2d 586 (2011).

[101] Neb. Rev. Code of Judicial Conduct § 5-302.7.

[102] Neb. Rev. Code of Judicial Conduct § 5-302.11(A).

[103] § 5-302.11(A)(1).

is timely if submitted at the earliest practicable opportunity after the disqualifying facts are discovered.[104]

[34,35] Assuming without deciding that the question of the juvenile court judge's disqualification was not waived, we find no merit to Joshua's assertion that the juvenile court judge should have been disqualified. There exists a presumption of judicial impartiality, and a party alleging that a judge acted with bias or prejudice bears a heavy burden of overcoming that presumption.[105] A judge's opinions based on facts presented during a hearing, even if those opinions are stated before the hearing's conclusion, are not indicative of bias by the judge unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.[106] The juvenile court judge's questioning and comment simply reflected the court's opinions based on the facts presented at the hearings and the judge's understanding of the law. Under the objective standard of reasonableness applicable to disqualification, the juvenile court judge's questions and comment would not cause a reasonable person to question his impartiality.[107]

## VI. CONCLUSION

In case No. S-20-009, we reverse the December 23, 2019, order denying Joshua's motion for placement and remand the cause with directions for further proceedings to develop a transition plan. In case No. S-20-244, we affirm the order of adjudication.

JUDGMENT IN NO. S-20-009 REVERSED, AND
CAUSE REMANDED WITH DIRECTIONS.
JUDGMENT IN NO. S-20-244 AFFIRMED.

---

[104] *Tierney v. Four H Land Co., supra* note 100.

[105] *In re Interest of Jamyia M.*, 281 Neb. 964, 800 N.W.2d 259 (2011).

[106] See *In re Interest of J.K.*, 300 Neb. 510, 915 N.W.2d 91 (2018).

[107] See *id.*