Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/01/2022 09:08 AM CDT

In re Interest of A.A. et al., children
under 18 years of age.
State of Nebraska, appellee, v. Joshua C.,
appellant, and Stacy J., appellee.

___ N.W.2d ___

Filed January 7, 2022.    No. S-21-421.

1. **Judgments: Appeal and Error.** The construction of a mandate issued
   by an appellate court presents a question of law, on which an appellate
   court is obligated to reach a conclusion independent of the determination
   reached by the court below.
2. **Appeal and Error.** Appellate review is guided and constrained by the
   assignment of error as articulated by the party appealing.
3. **Notice: Appeal and Error.** The assignments of error section is one of
   the most critical sections of an appellant's or cross-appellant's brief. It
   gives the opposing party notice of what alleged errors to respond to and
   advises the appellate court of what allegations of error by the trial court
   it has been called upon to address.
4. **Appeal and Error: Words and Phrases.** A "remand" is an appellate
   court's order returning a proceeding to the court from which the appeal
   originated for further action in accordance with the remanding order.
5. **Courts: Appeal and Error.** When a lower court is given specific
   instructions on remand, it must comply with the specific instructions and
   has no discretion to deviate from the mandate.
6. **Child Custody.** Temporary physical custody with a noncustodial parent
   should not create a substantial and unnecessary hindrance to efforts of
   reunification with the custodial parent.

Appeal from the Separate Juvenile Court of Lancaster
County: Reggie L. Ryder, Judge. Affirmed.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Patrick F. Condon, Lancaster County Attorney, and Haley N. Messerschmidt for appellee State of Nebraska.

Theresa Cusic, of Legal Aid of Nebraska, for appellee Stacy J.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

MILLER-LERMAN, J.

## NATURE OF CASE

Upon remand, following our opinions in *In re Interest of A.A. et al.*, 307 Neb. 817, 951 N.W.2d 144 (2020) (*A.A. I*), and *In re Interest of A.A. et al.*, 308 Neb. 749, 957 N.W.2d 138 (2021) (*A.A. II*) (denying motion for attorney fees), the separate juvenile court of Lancaster County held a hearing on reunifying the juvenile, B.C., from a foster home to the home of one of the child's biological parents. The juvenile court entered an order placing physical custody of the minor child with his biological mother, Stacy J., from whom B.C. had initially been taken. It also considered and overruled a motion for legal custody and placement of B.C. filed by the biological father, Joshua C. Joshua appeals the order of the juvenile court and claims that the order placing custody of B.C. with Stacy exceeded our mandate. We affirm.

## STATEMENT OF FACTS

*Prior Proceedings.*

The circumstances of B.C.'s removal from Stacy's home following a petition alleging child endangerment are set forth fully in our main opinion, *A.A. I, supra*, which we summarize below as relevant to the present appeal. The main opinion, published in November 2020, addressed two consolidated appeals from ongoing proceedings to adjudicate B.C., who had previously lived with Stacy and her other children. B.C. was removed from Stacy's home pending adjudication, upon a finding that remaining in Stacy's home would be contrary to B.C.'s health, safety, and welfare and would not be in B.C.'s best interests.

The parties agree that Joshua is B.C.'s biological father and had an established parental relationship with him. *Id.* Joshua intervened in the juvenile proceedings in October 2019 and alleged that with the exception of a then 1-year separation from Stacy, Joshua had lived with B.C. and provided continuous care and support for him. Joshua filed a motion requesting that B.C. be placed with him immediately. Although the State did not allege that Joshua was unfit to parent B.C., after a hearing, the court denied Joshua's motion for temporary placement on the ground of unfitness. The finding was based on concerns about Joshua's hospitalization and rehabilitation from Guillain-Barre syndrome just prior to the hearing and the juvenile court's conclusion that a transition plan needed to be in place before Joshua took custody of B.C. Joshua successfully appealed this order.

In our main opinion, we concluded, inter alia, that Joshua was deprived of due process when the court refused to recognize his parental preference over the State to B.C.'s custody and specifically by finding Joshua unfit without any formal allegation that would have placed Joshua on notice that he would be required to defend against an attempt by the State to prove he had lost the presumption of parental preference. *A.A. I, supra.* We remanded the cause to the juvenile court to develop a transition plan into Joshua's temporary physical custody after establishing the most up-to-date information. *Id.*

Subsequent to our main opinion, Joshua moved for an award of attorney fees, and we determined that the State was substantially justified in commencing juvenile proceedings seeking to adjudicate the child as endangered by Stacy and that attorney fees were not warranted. See *A.A. II, supra.* A mandate issued on April 13, 2021, ordering the juvenile court to enter judgment in conformity with our main opinion.

*Further Proceedings.*

During his appeal, Joshua opposed requests to speak with the Nebraska Department of Health and Human Services (DHHS). According to emails sent by Joshua's attorney in

November 2020, Joshua would not allow DHHS "to ply information from him regarding his physical or mental condition, beliefs, feelings, attitudes, practices, customs, personal history, associations, affiliations, or relationships, or the conditions of his home." Joshua proposed that DHHS should deliver the child with his personal items to Joshua and make arrangements for his school attendance and dependent benefits through Joshua's Social Security disability. Joshua threatened to terminate any discussion if DHHS personnel posed personal questions to him.

Our main opinion was filed on November 20, 2020. See *A.A. I, supra*. On November 25, DHHS proposed a transition plan into Joshua's care which recommended "a short physical transition," under which contact frequency and duration is increased. The transition plan included (1) a walkthrough of the residence of Joshua to ensure it is still in appropriate condition; (2) reasonable access to B.C.; (3) the ability for the assigned DHHS case manager to speak directly to Joshua regarding B.C.'s condition and needs so long as B.C. remains a state ward; (4) assurance that B.C.'s therapy will continue and to identify any barriers to continuance of the service, if any; and (5) B.C.'s continued enrollment in school. DHHS invited Joshua to suggest sibling visitation.

Joshua, through his attorney, resisted the terms of DHHS' plan, stating that "[t]here's not going to be a 'walkthrough' or any other of this stuff."

On April 6, 2021, DHHS moved the juvenile court for an order approving a change in placement for B.C. to the home of one of his parents. Joshua immediately moved the juvenile court to enter a dispositional order removing B.C. from the care and custody of DHHS and committing him to the care and custody of Joshua, without supervision or conditions, and to thereafter terminate its jurisdiction over B.C.

Subsequent to the filing of our main opinion, the juvenile court received the mandate from this court, which had been delayed because of continued appellate proceedings. The juvenile court scheduled a disposition hearing; a child support

hearing on various motions, including a hearing on the motion to award temporary legal custody; and a hearing on the motion to establish a transition plan. The hearings were held on May 14, 2021, where the juvenile court received evidence and arguments from the parties.

At the time of the hearing, B.C. was still a state ward and continued to reside out of the homes of both Stacy and Joshua. DHHS supported B.C.'s being placed with Joshua and, as noted, in November 2020, had proposed a transition plan for placement of B.C. with Joshua. However, Joshua continued to oppose the DHHS plan and, as reflected in his affidavit in the record, swore he had "no intention in taking part in the development or implementation of a 'plan' for the 'transition' of [B.C.] into my custody." As a result, without an appropriate transition plan, the juvenile court found it was not empowered to place custody with Joshua and still adhere to our mandate. The court overruled Joshua's motion for legal custody and motion for placement.

Next, the juvenile court turned to whether B.C. should be reunited with Stacy. The court found that Stacy had worked diligently with DHHS to correct the issues that led to the removal of B.C. The order noted that Stacy had been involved with intensive family reunification services, parenting classes, a psychological evaluation, individual counseling on an outpatient basis, family support, and a parenting assessment. Stacy was gainfully employed and maintained safe and stable housing. Her supervision had been lowered with respect to her probation as part of her criminal case. Significantly, Stacy had monitored parenting time with B.C. for about 7 months with no reported safety concerns and had overnight parenting time with B.C. for about 3 months prior to the hearing.

The court found that B.C. was "no longer in need of [a] foster care placement" and that it was in the best interests of B.C. to return to the physical custody of Stacy, subject to satisfaction of the terms of a transition plan. The transition plan, similar to that which DHHS had proposed to Joshua, provided that (1) DHHS will conduct a walkthrough of the residence of

the mother to ensure it is in appropriate condition prior to placement; (2) the mother shall allow DHHS and the guardian ad litem reasonable access to B.C.; (3) the assigned DHHS case manager shall have the ability to speak directly to the mother regarding B.C.'s condition and needs, so long as B.C. remains a state ward; (4) the mother shall ensure that B.C.'s therapy continues, so long as B.C.'s therapist recommends a continued need for therapy services; (5) the mother shall ensure that B.C. is enrolled in school; (6) the mother shall fully cooperate with "random drop-ins" of her residence by DHHS or its designee; and (7) a family therapy session shall occur between B.C, his therapist, and the mother prior to placement back in the home of the mother, so that B.C. is adequately prepared for the transition. The foster parents would be invited to participate in this therapy session.

The juvenile court granted DHHS' motion for a placement change and ordered that the physical custody of B.C. be placed with Stacy upon her completion of the conditions of the above transition plan.

Joshua appeals.

## ASSIGNMENT OF ERROR

As his sole assignment of error, Joshua claims that "[t]he juvenile court's order placing custody of B.C. with Stacy was void because it exceeded the juvenile court's authority under the mandate."

## STANDARD OF REVIEW

[1] The construction of a mandate issued by an appellate court presents a question of law, on which an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *State v. Harris*, 307 Neb. 237, 948 N.W.2d 736 (2020).

## ANALYSIS

As his sole assignment of error, Joshua claims that "[t]he juvenile court's order placing custody of B.C. with Stacy was void because it exceeded the juvenile court's authority under

the mandate." The order on appeal filed May 18, 2021, determined a number of issues, including overruling Joshua's motion for legal custody, sustaining DHHS' motion for a placement change, and placing physical custody with Stacy.

[2,3] As an initial matter, we iterate that the scope of our appellate analysis is determined by the error assigned. That is, our appellate review is guided and constrained by the assignment of error as articulated by the party appealing. See Neb. Ct. App. P. § 2-109(D) (rev. 2021). See, also, Neb. Rev. Stat. § 25-1919 (Reissue 2016); *In re Interest of Mekhi S. et al.*, 309 Neb. 529, 960 N.W.2d 732 (2021); *Great Northern Ins. Co. v. Transit Auth. of Omaha*, 308 Neb. 916, 958 N.W.2d 378 (2021). We have repeatedly refused to waive the requirement of § 2-109(D)(1) that an appellant set forth a separate and concise statement of each error the party contends was made by the trial court, through separately numbered and paragraphed assignments of error contained in a separate section of the brief, designated with an appropriate heading, and located after the statement of the case and preceding the propositions of law. *Great Northern Ins. Co., supra*. The assignments of error section is one of the most critical sections of an appellant's or cross-appellant's brief. *Id*. It gives the opposing party notice of what alleged errors to respond to and advises the appellate court of what allegations of error by the trial court it has been called upon to address. *Id*. Designated assignments of error are required not only by our court rules but also by § 25-1919, which states that "[t]he brief of appellant shall set out particularly each error asserted and intended to be urged for the reversal, vacation, or modification of the judgment, decree, or final order alleged to be erroneous . . . ." Accordingly, we decline to take up additional claims beyond that concerning "[t]he juvenile court's order placing custody of B.C. with Stacy . . . ."

[4,5] The focus of Joshua's assignment of error is on placement of B.C. with Stacy and the relationship of such placement vis-a-vis our main opinion and mandate. Thus, we review several principles of procedure following an appeal. A "remand"

is an appellate court's order returning a proceeding to the court from which the appeal originated for further action in accordance with the remanding order. *TransCanada Keystone Pipeline v. Tanderup*, 305 Neb. 493, 941 N.W.2d 145 (2020). When a lower court is given specific instructions on remand, it must comply with the specific instructions and has no discretion to deviate from the mandate. *Id.* But it is also true, as we recognized in our main opinion, *A.A. I*, that the juvenile court has retained its continuing jurisdiction over this juvenile matter even during Joshua's prior appeal. See *In re Interest of Jedidiah P.*, 267 Neb. 258, 673 N.W.2d 553 (2004).

Referring to *A.A. I*, Joshua highlights that we reversed the juvenile court's order that denied Joshua's motion for placement and remanded the cause "with directions to grant Joshua temporary physical placement after establishing, with the most up-to-date information, an appropriate plan for B.C.'s transition into Joshua's temporary physical custody." 307 Neb. at 851, 951 N.W.2d at 171. From this, Joshua maintains that he is entitled to B.C.'s placement non plus ultra. We do not agree.

[6] Contrary to Joshua's argument and assignment of error, nothing in our opinion or mandate was antithetical to reunification of B.C. with Stacy, nor did our previous disposition undermine the juvenile court's power to expeditiously proceed with Stacy's "rehabilitative plan and placement of the children back in her care." *A.A. I*, 307 Neb. at 860, 951 N.W.2d at 175. The portion of our main opinion which Joshua asserts stripped the juvenile court of power concerned temporary physical custody of B.C. with a parent as a preferred alternative to placement with a nonparent. We explained that at the time of B.C.'s removal, Stacy was the de facto custodial parent; and further, the juvenile court had the power to require her cooperation with orders of visitation and its reunification plan which could return B.C. to her home. *A.A. I, supra*. We noted that temporary physical custody with a noncustodial parent should not create a "'substantial and unnecessary hindrance to efforts of reunification'" with the custodial parent. *Id*. at 852, 951 N.W.2d at

171 (quoting *In re Interest of Ethan M.*, 15 Neb. App. 148, 723 N.W.2d 363 (2006)).

In our main opinion, we explained that a juvenile court may exercise its parens patriae responsibilities to "develop a transition plan constituting a reasonable intrusion of limited duration into the nonoffending parent's rights to autonomy in the care and custody of the child." *Id.* at 850, 951 N.W.2d at 170. We explained that it would not violate due process for the juvenile court to adjudicate custody rights between two parents to require the nonoffending parent's cooperation of goals with reunification back into the home from where the child was taken. *Id*. We emphasized that the juvenile court needed to establish the most up-to-date information in developing an appropriate plan for temporary placement. See *A.A. I, supra*.

As noted, the juvenile court always retained continuing jurisdiction to adjudicate B.C., and if warranted by up-to-date facts, it could proceed with a plan of reunifying B.C. with Stacy, the only parent over whom the court had jurisdiction at the time reunification was proposed. The fact that Joshua may have been proceeding on a parallel track to acquire temporary placement did not eclipse the potential for Stacy to acquire placement. The mandate associated with our main opinion, favorable to placement with Joshua, was not issued to the exclusion of "goals of reunification back into the home from where the child was taken." *Id.* at 850, 951 N.W.2d at 170. Accordingly, Joshua's sole assignment of error in which he claimed that placement of B.C. with Stacy exceeded the mandate is without merit.

## CONCLUSION

The juvenile court's order placing B.C. with Stacy pursuant to the terms of a transition plan were consistent with our opinion and mandate in *A.A. I., supra*. We affirm.

Affirmed.